Argued December 9, 1971, modified April 4, 1972

# NORTHWEST LUMBER SALES, INC., *Respondent,* v. CONTINENTAL FOREST PRODUCTS, INC., *Appellant.*

495 P2d 744

*Denton G. Burdick, Jr.,* Portland, argued the cause for appellant. On the briefs were Hutchinson, Schwab & Burdick.

*Daniel J. Seifer,* Portland, argued the cause for respondent. With him on the brief were Kobin & Meyer.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE and HOLMAN, Justices.

McALLISTER, J.

This is a dispute between two wholesale lumber dealers involving three carloads of forest products. Northwest Lumber Sales, Inc., is a Washington corporation, with its office in Spokane, and the defendant Continental Forest Products, Inc., is an Oregon corporation with its office in Lake Oswego. Neither party was satisfied with the decree of the trial court and the defendant has appealed and the plaintiff cross-appealed. Since the case is tried de novo in this court we will relate the controlling facts.

The controversy centers on a car of plywood which defendant's employee Jack Cutsforth, referred to as a lumber trader, ordered from plaintiff on December 19, 1968. Defendant's purchase order called for shipment in two weeks and stated that defendant would advise plaintiff later of the destination and routing of the car. On December 20 plaintiff acknowledged the order on those terms. On January 3, 1969, defendant sold the car of plywood to a customer in Illinois.

For reasons which will appear later, plaintiff did not ship the plywood to defendant's customer and

defendant had to buy a car of plywood from another source at a substantially increased price and sustained a loss on the transaction of $4,387.97. After the dispute arose over the plaintiff's liability for failing to deliver the plywood, defendant declined to pay plaintiff for a carload of select pine lumber which it had bought from plaintiff. Plaintiff then, in turn, refused to ship defendant a carload of 2 x 4 dimension lumber referred to as "studs," which it had sold to defendant. Defendant had to buy a replacement car of studs on a rising market at a loss of $2,096.60.

We next describe the legal posture of this suit. Plaintiff took the initiative by filing an action against defendant in Washington for the purchase price of the car of pine lumber which it had sold to defendant. A default judgment was entered against defendant.

Plaintiff next brought a proceeding in the Circuit Court for Multnomah County pursuant to ORS 24.010-.180[1] to register its judgment against defendant. Defendant answered and both challenged the validity of the Washington judgment and attempted to counterclaim for its losses sustained in replacing the car of plywood and the car of studs. The counterclaims were stricken on motion of plaintiff. Defendant then filed an equitable defense, alleging its two claims against plaintiff as setoffs against plaintiff's judgment. The trial court denied a motion to strike the equitable answer and plaintiff has not challenged that ruling in this court.[2]

---

[1] Uniform Enforcement of Foreign Judgments Act.

[2] The trial court allowed the motion to strike the counterclaims on the authority of ORS 24.080, which states what defenses may be raised in a statutory proceeding to register a foreign judgment. The order has not been assigned as error, so

When the case came on for trial defendant stipulated that plaintiff should have a judgment for the invoice price of the car of pine lumber in the sum of $7,999.06 together with interest. This left for trial only defendant's setoff claims for the car of plywood and the car of studs. The trial court allowed the setoff for the studs and denied the setoff for the plywood. As we have indicated, defendant then appealed from the denial of its plywood setoff and plaintiff cross-appealed from allowance of the setoff involving the studs.

■ We turn next to the setoff involving the plywood. It appears that a lumber dealer in Salt Lake City, named Davidson, had on hand some plywood designed for use as concrete forms known as "plyform," "which had been involved in a train derailment." Davidson enlisted plaintiff's help in selling a car of this plywood and after some negotiation plaintiff sold a car of plywood to defendant on December 19, 1968.

we need not decide whether the trial court's construction of the statute was correct.

Equitable jurisdiction was invoked on the ground that because plaintiff is a nonresident corporation, defendant could not assert its claims in a court of law except by resorting to the courts of plaintiff's home state. Nonresidence of the plaintiff has been held to be a proper ground for permitting the defendant to plead his claims as equitable setoffs. Walter E. Heller & Company v. Lindsey, 146 Colo 452, 361 P2d 979, 981 (1961); Plattner Implement Co. v. Bradley, Alderson & Co., 40 Colo 95, 90 P 86, 90 (1907); Anderson v. Biggs, 118 Ind App 266, 77 NE2d 909 (1948); Arcadia Knitting Mills v. Elliott Mfg. Co., 89 NH 188, 195 A 681, 682 (1937); Caldwell v. Stevens, 64 Okla 287, 167 P 610, 612 (1917). This ground for allowing the pleading of an equitable setoff has been recognized in our cases. Pearson v. Richards, 106 Or 78, 93, 211 P 167 (1922); Hansen v. Day, 99 Or 387, 391, 195 P 344 (1921); Smith v. Willis, 84 Or 270, 276-279, 163 P 810 (1917). As plaintiff has not assigned as error the denial of its motion to strike the equitable setoffs, we need not decide in this case whether plaintiff's nonresidence, without more, is sufficient to invoke the jurisdiction of a court of equity.

The evidence indicates that defendant did not know at that time that plaintiff was buying the plywood from Davidson or that plaintiff intended to ship defendant plywood which had been in a train wreck. The disposition of this setoff turns on whether defendant consented on or about December 30th to a cancellation of this order. Plaintiff contends the order was cancelled, which is denied by defendant. The trial court resolved this issue in favor of plaintiff.

We think defendant has proved its first setoff by a preponderance of the evidence and will briefly point to some of the evidence which we find persuasive. In the first place, there is no evidence of any conduct by defendant indicating that it had ever agreed to cancel its order for the car of plywood. It resold the plywood on January 3, 1969, and on January 13th or 14th inquired of plaintiff by telephone if the plywood had been shipped and asked for the shipping date and car number.

According to Cutsforth, he learned for the first time during that January telephone call that plaintiff had planned to furnish the plywood from Davidson's stock, that the stock had been damaged, and, because the damage was more extensive than anticipated, Davidson could not furnish the plywood. According to Cutsforth, plaintiff wanted to cancel the order, but Cutsforth informed plaintiff's sales manager, Donald Mast, that defendant had sold the plywood and would insist that plaintiff perform its contract. Thereafter defendant uniformly insisted that plaintiff ship a car of plywood for delivery to defendant's customer.

Both plaintiff's sales manager, Don Mast, and its trader, Lee Erwert, who had sold the plywood to defendant's trader, Cutsforth, testified that they called

Cutsforth on or about December 30, 1968, and informed him that Davidson's supply of plywood was so badly damaged that Davidson could not supply the plywood which plaintiff had intended to sell to defendant. Both men testified that Mast asked that the order be cancelled and that Cutsforth said there was "no problem" because defendant had not resold the plywood and that Cutsforth, in effect, agreed to cancel the order. It will be noted that the conversation which Mast and Erwert contended occurred on December 30, 1968, was substantially the same as the conversation which Cutsforth claimed occurred on or about January 13th except for one detail. Mast and Erwert insisted that Cutsforth had agreed on December 30th to cancel the order and Cutsforth testified that he uniformly insisted that plaintiff deliver a car of plywood as it had agreed to do.

In choosing between these two versions of what appears to have been a single telephone call, we must rely on other evidence. Each party had an equal motive for tailoring its version of this crucial conversation. The plywood market was rising sharply during this period. Whether defendant had agreed to cancellation would determine which company would have to go into the market to cover the order and bear the consequent loss. If this case turned solely on the direct evidence about the telephone call we might find the scales evenly balanced. We think, however, that inconsistencies in plaintiff's evidence tip the scales in defendant's favor.

We find Cutsforth's testimony more credible for several reasons. First, we think if the order had been cancelled on December 30, 1968, plaintiff would have sent a written memorandum of the cancellation to defendant. We have taken note of the testimony that much of the business transacted between plaintiff and

defendant was on an informal word-of-mouth basis. However, defendant's written order for a car of plywood was immediately acknowledged in writing by plaintiff. In view of the admittedly unstable market we think it is significant that plaintiff did not send a memorandum of the cancellation to defendant.

On February 6, 1969, Cutsforth wrote plaintiff a letter for the attention of Lee Erwert in which he castigated Don Mast for failing to promptly inform him that Davidson was unable to supply the plywood. The letter read in part as follows:

"Hope you are making some progress with your Utah man on the concrete form, Lee as this situation is getting worse by the hour.

"It's unfortunate that Don Mast didn't advise us prior to our selling the car that your supplier was in trouble. Had he done so we could have scratched the whole thing but on January 3rd we sold the car and sent you shipping instructions on the order.

"Now we must produce and ask that your company do the same.

\* \* \* \* \*

"We realize you were in the hospital when Don Mast found out about the nonperformance of your supplier and it is a shame he couldn't have called us to let us know. It peeves me plenty that he would knowingly sell me freight damaged stock without letting me know about it.

"Here you are exposed to a hell of a loss to your account and it could have been prevented with a little cooperation from Don. I wish there was some way out but there isn't so stay on top of this Lee, pin your Utah man to his obligation and lets get this settled."

Cutsforth wrote again on February 17th notifying plaintiff that unless plaintiff furnished the plywood

by February 24th defendant would buy a replacement car. Erwert's reply, dated February 20th, to the February 6th and February 17th letters from Cutsforth, made no reference to a cancellation of the plywood order. But, on the contrary, it stated that plaintiff would still attempt to have Davidson ship the plywood. The letter said, in part:

"As far as the other file goes, as we discussed, we will do everything we possibly can to straighten this out and have Davidson Lumber Sales, who the order is placed with, ship the same.

"We will keep you posted and advised at all times of our actions and our results on this. Thank you very much for your prompt reply. * * *"

Erwert testified in the trial court that he had known since before December 30th that Davidson could not ship a car of plywood because his stock was too badly damaged. There is no evidence that plaintiff expected Davidson to buy a replacement car on the open market. If, in fact, defendant had agreed to cancel the plywood order on December 30th we would expect Erwert's letter of February 20th to consist of a terse, but emphatic, reminder that the order had been cancelled and an unequivocal statement that plaintiff was therefore under no further obligation of any kind on account of the cancelled order.

We next take note of a letter dated February 27, 1969, written by Don Mast containing the following paragraph:

"On approximately December 30th I advised Lee Erwert that this stock would not be available because of our account, the Davidson Lumber Sales, who had bought it from someone else, called and reported that the stock was not the grade that he had contracted for. At that time Mr. Erwert dis-

cussed this with Jack Cutsforth and I in turn got on the phone and discussed it with Jack and explained to him that what Dave thought he was buying actually was not of that grade and if it shipped there would be nothing but trouble with it because it would not meet the grade. Again at that time, Jack stated on the phone that he did not feel there would be any problem with it and that he would advise us later."

If the order had been cancelled on December 30th, as Mast later testified, there would have been no reason for Cutsforth to "advise us later" as stated in the last phrase of the paragraph noted above. The following day a revised edition of Mast's letter, dated February 28th, was mailed to defendant in which the incriminating phrase "and that he would advise us later" was eliminated. We attach some importance to the fact that it was not until February 27, 1969, that plaintiff first made a claim in writing that the plywood order had been cancelled on December 30th and, as we have pointed out, the first such claim was not unequivocal.

In short, the evidence indicates that defendant's posture throughout these events was consistent with its claim that the plywood order was never cancelled, while plaintiff's claim of cancellation appears to have been an afterthought. Defendant's claim for setoff on account of the plywood order should have been allowed.

■ We consider next the issues raised by plaintiff's cross-appeal from the trial court's allowance of the setoff involving the studs. Defendant ordered the studs in November, 1968. There was a delay in shipment by plaintiff's supplier, and the order was still pending when, because of the dispute over the plywood, defendant withheld payment for the order of pine lumber.

On March 4, 1969, defendant's attorneys wrote to plaintiff stating that if the studs were not shipped by March 10, defendant would buy the studs elsewhere and deduct any loss from the amount due on the pine lumber order. Plaintiff's attorneys, on March 7, answered by letter in which they stated that payment for the pine lumber was then approximately thirty days past due:

"* * * In view of this circumstance, and under the terms and conditions of quotation and sale of the Association to which these parties belong and subject to which the orders written are made, my client declines to ship by reason of the failure of yours to pay. * * *"

The issues on appeal concern the effect of the "terms and conditions" referred to in that letter.

Plaintiff's written acknowledgment of the stud order provides:

"* * * These goods will be shipped under the terms and conditions of sale of the Western Pine Association unless otherwise specified, * * *."

The Western Pine Association was no longer in existence at the time the order was placed. Witnesses for both parties testified that a new organization, the Western Wood Products Association, had taken its place. The "Terms and Conditions of Quotation and Sale" of the Western Wood Products Association provide, in paragraph VI b:

"*The seller shall have the right to cancel* on account of any arbitrary deductions made by the buyer with respect to, or failure to comply with, contract terms in respect to any prior shipment, or *on account of* any transfer of or change in the buyer's business, his insolvency, suit by other creditors, *failure of buyer to meet financial obli-*

*gations to seller,* impairment of buyer's credit information, or for unfavorable credit reports made to seller through usual channels of credit information unless the buyer shall promptly furnish to the seller's satisfaction guaranty of full payment for any shipment made or to be made. Notice of such cancellation shall be given in writing." (Emphasis added.)

Plaintiff contends that under the italicized portion of this paragraph it had the right to cancel the stud order when defendant failed to pay for the pine lumber, and that its attorneys' letter of March 7 gave the required notice of cancellation. Defendant contends that under a proper construction of paragraph VI b, plaintiff was not entitled to cancel the order. We have concluded that defendant is correct. We therefore find it unnecessary to reach the question, which the trial court found determinative, whether there was sufficient evidence that the parties understood the reference to the Western Pine Association to apply to the Western Wood Products Association.

We may assume that Paragraph VI b of the Association's terms and conditions was incorporated into the contract between the parties. We also assume for purposes of this decision, although defendant contends otherwise, that defendant's action in withholding payment for the pine lumber order was not legally justified and that defendant had failed to meet a financial obligation to plaintiff. The question is whether this failure justified plaintiff in cancelling the stud order.

Neither the Uniform Commercial Code nor general contract law gives either party to a contract the right to refuse performance because the other has breached a separate contract between them. See ORS 72.7030, 72.7170; 3A Corbin on Contracts 290-291 § 696;

6 Williston on Contracts (3d ed 1962) 535 § 887D; 27 ALR 1157. Plaintiff's right of cancellation depends solely on the provisions of paragraph VI b of the Association's terms and conditions. That right of cancellation exists only "unless the buyer shall promptly furnish to the seller's satisfaction guaranty of full payment for any shipment made or to be made." Plaintiff never requested such a guarantee; although the terms and conditions do not specifically state that the seller must make such a request, we construe them to include that requirement. The seller's right of cancellation may also be exercised for a number of reasons under paragraph VI b, among them being unfavorable credit information. A buyer might be totally unaware of such matters unless the seller called them to his attention. The provision for furnishing a guarantee of payment would at times be meaningless unless the provision is construed to require the seller to request such a guarantee before exercising his right of cancellation.

The alternative construction, requiring the buyer to take the initiative without notice or request by the seller, would be of doubtful validity under the Uniform Commercial Code. ORS 72.6090 provides for the right of either party to suspend performance if there are reasonable grounds for insecurity as to the other's performance; assurance of performance may then be demanded in writing, and a failure to provide adequate assurance within a reasonable time after demand may be treated as a repudiation of the contract. ORS 71.1020 (3) provides:

"The effect of provisions of the Uniform Commercial Code may be varied by agreement, except as otherwise provided in the Uniform Commercial Code and except that the obligations of good faith,

diligence, reasonableness and care prescribed by the Uniform Commercial Code may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

Paragraph VI b is a variation of the terms of ORS 72.6090 by agreement of the parties, and should be construed with reference to that provision. The Official Comments to UCC 2-609 (ORS 72.6090) state:

"6. Clauses seeking to give the protected party exceedingly wide powers to cancel or readjust the contract when ground for insecurity arises must be read against the fact that good faith is a part of the obligation of the contract and not subject to modification by agreement and includes, in the case of a merchant, the reasonable observance of commercial standards of fair dealing in the trade. Such clauses can thus be effective to enlarge the protection given by the present section to a certain extent, to fix the reasonable time within which requested assurance must be given, or to define adequacy of the assurance in any commercially reasonable fashion. But any clause seeking to set up arbitrary standards for action is ineffective under this Article."

The mere fact that payment under one contract is not made when due is not necessarily a reasonable ground for insecurity as to payment under another contract. In the present case there was no question of defendant's financial ability to pay its bills; plaintiff knew that defendant was withholding payment in order to cover possible losses when it replaced the plywood order, and the amount withheld was clearly more than enough for that purpose.

But even if plaintiff had reason to suppose that defendant might also refuse to pay for the stud order

if it was shipped, cancellation of the stud order without a prior request for guarantee of payment was not justified. A construction of paragraph VI b which would permit such cancellation without prior notice and opportunity to furnish a guarantee would permit sellers to act in an arbitrary fashion.

We cannot say that a request for guarantee would have been futile in this case. There is no apparent reason why defendant would not have been willing to guarantee payment of the stud order, and it might well have offered a conditional guarantee or escrow arrangement as to the amount due for the pine lumber which would have protected both parties. Defendant should at least have been offered the opportunity to suggest a reasonable method of assurance of performance.

We hold, therefore, that plaintiff's cancellation of the stud order was unjustified and that the trial court correctly held plaintiff liable for defendant's losses in covering that order in the market.

The trial court's decree is modified to provide that the defendant is entitled, in addition to the setoff allowed by the trial court against plaintiff's judgment, to a further setoff in the amount of $4,387.97 plus interest at six per cent from February 25, 1969. As so modified, the decree of the trial court is affirmed.

Defendant is entitled to recover costs in this court.