**NATIONAL FARMERS ORGANIZATION, an Iowa Corporation, Plaintiff,**

v.

**COAST TRADING COMPANY, INC., a Washington Corporation, Defendant.**

**Civ. No. 72–899.**

United States District Court, D. Oregon.

Dec. 1, 1977.

Norman J. Wiener, R. Alan Wight, Peter C. Richter, Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for plaintiff.

Norman L. Lindstedt, David J. Buono, Lindstedt & Buono, Portland, Or., for defendant.

## OPINION

SOLOMON, District Judge:

Plaintiff, National Farmers Organization (NFO), filed this action to recover more than $450,000 for grain delivered under contracts with the defendant, Coast Trading Company, Inc. (Coast). Coast filed a counterclaim for damages, asserting that NFO failed to deliver grain under those and other contracts.

NFO asserted that it stopped shipping because Coast failed to make timely payments for grain already delivered. Coast, on the other hand, asserted that it stopped

making payments because of NFO's failure to deliver. Both parties eventually cancelled all the contracts.

The case was tried to the court. The parties stipulated that if NFO were liable, Coast's damages as of the dates it cancelled the contracts amounted to about $597,000. I held that NFO breached the contracts because it was unable to deliver the grain and that Coast was justified in withholding payments. I awarded Coast $147,055.56 in damages in excess of what Coast owed NFO for grain delivered. I also awarded Coast $26,340.15 which was due Coast for NFO's breach of a storage agreement. That amount is not in issue here.

NFO appealed the judgment to the Court of Appeals. In its appeal, NFO made three contentions:

1. All contracts must be considered separately to determine if there was a breach in each case.

2. If Coast covered, the price of grain on the date of cover, rather than on the date of Coast's cancellation, was the proper price for calculating damages.

3. When there was no cover, the proper price for calculating damages was the price on the date Coast learned of the breach.

I had held that NFO did not have enough grain to meet its contract obligations because after the Russian wheat deal was announced, NFO's farmers were not delivering under their contracts in order to receive the higher current prices.

The Court of Appeals did not question these findings on the causes of the breach. Nevertheless, the Court of Appeals, in an unpublished memorandum opinion citing *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc.*, 261 Or. 480, 495 P.2d 744 (1972), ruled that the contracts should have been considered separately and that damages should have been based on the date of cover or, in the absence of cover, on the date Coast knew of NFO's breach. The Court remanded the case to this court to take further evidence and to make findings in accordance with its opinion.

On October 6, 1977, I tried this case on the remand. Evidence, including evidence from the first trial, was admitted.

The parties have stipulated that on 22 of the 48 contested contracts, NFO shall receive $174,064.07 and Coast shall receive $180,807.15. The parties have also stipulated that NFO is entitled to receive $276,-314.40 for grain delivered on the remaining 26 contracts, subject, however, to any damages to which Coast may be entitled by reason of breaches by NFO. The parties have agreed that Coast was entitled to cancel Contract 1279–309, but disagree on Coast's damages.

The parties disagree on both liability and damages on seven of the other contracts; on the remaining 18 disputed contracts, they disagree on liability. NFO does not deny that if it is liable on these 18 contracts, the proper date for determining damages is November 2, 1972, and that Coast would be entitled to $216,675.77 in damages.

■ A preliminary issue involves the allocation of shipments. Under Coast's procedures, shipments received were allocated to the oldest contract not yet filled. NFO, on the other hand, designated specific farmers' grain for specific Coast contracts and allocated the grain shipments to the corresponding Coast contract regardless of whether the farmers who had contracted to supply grain for earlier shipments had delivered.

As a result of the conflict in procedures, when farmers who supplied grain for earlier contracts were late in delivering their grain, Coast's and NFO's accounts differed in their allocation of shipments to contracts. This dispute amounts to $6,144.00. In a footnote to its memorandum, the Court of Appeals alluded to NFO's contract practice with apparent approval. I therefore hold that NFO's allocation practice is the proper one and that NFO is entitled to the $6,144.00.[1]

1. I have some misgivings about approving this allocation system because Coast dealt only

with NFO, not the individual farmers. NFO refused to reveal the names of the farmers and

The Court of Appeals ruling requires a separate analysis of the state of performance of each contract. But some general background is applicable to all the contracts.

On September 1, 1972, Coast informed NFO that if NFO failed to perform, Coast would withhold payments due NFO for grain delivered to offset damages accrued because of failures to deliver in a rising market. Coast later withheld payments on different contracts at different times and in mid-October cancelled some of the contracts.

On October 20, 1972, NFO notified Coast that upon payment for grain already delivered, NFO would continue its shipments. Four days later, Coast notified NFO that Coast owed NFO only a nominal amount when accrued damages were deducted from the amount billed for grain delivered. Coast stated that it was willing to create an escrow account, but that it would withhold payments until it determined whether NFO fulfilled its obligations to deliver grain due October 31, 1972.

The parties later agreed to hold a meeting to try to resolve their differences. At the first meeting, held on October 30, 1972, Coast again suggested the escrow account with the money to be released as NFO delivered grain. The parties also discussed the posting of a performance bond by NFO in return for Coast's immediate release of money owed NFO. Coast said it would post a bond if NFO did. NFO said that it had grain available and that it would make deliveries if they could be rescheduled.

On the following day, NFO announced that it would not post a bond and that it would not make deliveries even on an extended schedule unless Coast paid for the

grain already delivered. Coast said it was willing to place the money in an escrow account to secure payments for NFO and to protect Coast against further delivery failures.

On November 1, 1972, a third meeting was held. NFO submitted an escrow proposal which called for Coast to pay NFO $209,000 for grain delivered and to place $100,000 in an escrow account. The escrow funds were to be released as NFO delivered grain according to either of two extended schedules. Coast rejected the proposal because the extended deliveries were too far in the future and because NFO failed to give security to insure that it would perform.

Thereafter, Coast by letter cancelled all previously uncancelled contracts which called for delivery through October 31, 1972. Later that day, NFO by letter cancelled all outstanding contracts. On November 9, 1972, Coast by letter cancelled all contracts calling for delivery after November 1, 1972, effective November 2, 1972.

Of the 26 contracts now in dispute, seven involve questions of both liability and damages, one involves the question of damages only, and eighteen involve the question of liability.

On the issue of liability in six of the seven contracts in which both liability and damages must be determined, Coast contends that: (1) the total amount it withheld as an offset on all contracts never exceeded the amount of accrued damages; (2) the withholding of payments did not constitute a breach of the whole contract under ORS 72.6120(3)[2] and therefore NFO was not entitled to withhold delivery or to cancel under ORS 72.7030(1) or ORS 72.7030(6)[3]; and

admitted that it made no difference to the farmers whether Coast paid on a specific contract because the farmers would be entitled to be paid and were paid from a farmer-supported and NFO-administered fund when Coast did not pay.

**2.** ORS 72.6120(3) provides:

"Whenever nonconformity or default with respect to one or more instalments substantially impairs the value of the whole contract there is

a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming instalment without seasonably notifying of cancellation or if he brings an action with respect only to past instalments or demands performance as to future instalments."

**3.** ORS 72.7030(1) and (6) provide:

"Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a

(3) if NFO did have a right to withhold deliveries or cancel, it waived those rights by continuing to ship grain, by not seeking assurances and by not timely cancelling.

On the barge contract, Contract 1495–643, Coast contends that NFO was not entitled to cancel.

Coast also contends that it was entitled to cancel the 18 contracts which called for delivery after November 1, 1972, because NFO's letter of November 1, 1972, cancelling all outstanding contracts was an anticipatory repudiation under ORS 72.6100.[4]

NFO, on the other hand, contends that on the group of six contracts: (1) the Court of Appeals decision precludes consideration of all the contracts together; (2) NFO was performing on these contracts; (3) Coast breached by withholding payments; (4) late deliveries did not substantially impair the value of the contracts to Coast; (5) Coast reinstated the contracts when it accepted

late deliveries; and (6) Coast repudiated the contracts.

On the barge contract, NFO contends that it was entitled to cancel either because Coast failed to pay for grain delivered on other contracts or because Coast had refused to make future payments.

On the 18 contracts calling for delivery after November 1, 1972, NFO contends that it was entitled to cancel because Coast failed to give adequate assurances demanded under ORS 72.6090.[5]

■ Notwithstanding the Court of Appeals' decision, NFO has now abandoned its cover theory on the damage issue. If Coast is entitled to damages, it is entitled to the differences between the contract price and the market price at the time Coast learned of the breach under ORS 72.7130(1).[6]

■ I hold that the proper date for calculating damages on the seven contracts calling for delivery before November 1, 1972, is the first business day after the last date of

payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract as provided in ORS 72.6120, then also with respect to the whole undelivered balance, the aggrieved seller may:
    (1) Withhold delivery of such goods.

    .    .    .    .    .

    (6) Cancel."

**4.** ORS 72.6100 provides:
    "When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
    (1) For a commercially reasonable time await performance by the repudiating party; or
    (2) Resort to any remedy for breach as provided in ORS 72.7030 and 72.7110, even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
    (3) In either case suspend his own performance or proceed in accordance with the provisions of ORS 72.7040 on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods."

**5.** ORS 72.6090 provides:
    "(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
    (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
    (3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
    (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

**6.** ORS 72.7130(1) provides:
    "Subject to the provisions of ORS 72.7230 with respect to proof of market price, the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in ORS 72.7150, but less expenses saved in consequence of the seller's breach."

delivery called for in the contracts. The proper date for calculating damages on Contract 1379–327, which called for delivery by December 1, 1972, but which NFO cancelled on November 1, 1972, is November 2, 1972. The proper date for calculating damages on the other 18 disputed contracts is November 2, 1972.

Contract 1324–320 called for delivery of 100,000 bushels of # 1 dark Northern Spring 14% Protein wheat by November 1, 1972, at $2.10 a bushel. By the end of the delivery period, NFO had shipped only 20,-436 bushels, leaving a balance due of 79,564 bushels. Coast's first payment was due September 28, 1972, under the course of dealing the parties had established. Coast made no payments for any of the grain delivered for which the parties agree Coast owed NFO $34,200.43. Coast cancelled the contract on November 1, 1972.

■ Absent a showing that Coast's failure to pay substantially impaired the value of the contract, NFO was not relieved of its duty to deliver the grain. *Gulf Chemical and Metallurgical Corporation v. Sylvan Chemical Corporation*, 122 N.J.Super. 499, 300 A.2d 878 (Sup.Ct.N.J.1973) *aff'd*, 126 N.J.Super. 261, 314 A.2d 73 (App.Div.N.J. 1973). NFO points to the testimony that farmers were not meeting their contract obligations because of Coast's failure to pay. At the earlier trial, I ruled that the testimony was false and that NFO was under a duty to continue deliveries.

■ NFO's failure to deliver in a rising market, on the other hand, did substantially impair the value of the contract for Coast, and Coast was entitled to cancel at the end of the delivery period under ORS 72.-7110(1).[7] The United States Department of Agriculture (U.S.D.A.) price for the grain on November 2, 1972, was $2.41 a bushel. Coast is entitled to $24,664.84 in damages

on Contract 1324–320 as an offset against the $34,200.43 it owes NFO on the contract.

Contract 1415–342 called for delivery of 25,000 bushels of # 1 dark hard Winter ordinary wheat by November 1, 1972, at $1.96 a bushel. By November 1, 1972, NFO had shipped 20,940 bushels, leaving a balance due of 4,060 bushels. Coast's first payment was due October 16, 1972. It made no payments for the grain delivered, for which the parties agree Coast owed NFO $33,570.07. Coast cancelled the contract on November 1, 1972. The U.S.D.A. price for the grain on November 2, 1972, was $2.32 a bushel.

For the same reasons set forth in connection with Contract 1324–320, Coast is entitled to $1,461.60 in damages on Contract 1415–342 as an offset against the $33,570.07 it owes NFO on the contract.

Contract 1272–304 called for delivery of 50,000 bushels of # 1 dark hard Winter ordinary wheat by September 16, 1972, at $1.68 a bushel. Through October 21, 1972, NFO shipped 24,776 bushels, leaving a balance due of 25,224 bushels. Coast made payments on the first shipments of $8,901.00. The parties agree Coast owed NFO an additional $22,873.09 for grain delivered. The first payment Coast failed to make was due October 2, 1972. This was more than two weeks after the final delivery date under the contract. Coast was privileged to cancel the contract on October 18, 1972.

■ Coast was entitled to withhold damages already accrued under ORS 72.7170 [8] after giving proper notice. Coast gave that notice on September 1, 1972. The U.S.D.A. price for the grain on September 18, 1972, was $2.05 a bushel. Although Coast withheld more than the amount of accrued damages on this contract, NFO was still under

---

**7.** ORS 72.7110(1) provides:

"Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract as provided in ORS 72.6120, the buyer may cancel . . . ."

**8.** ORS 72.7170 provides:

"The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

the duty to continue deliveries. Coast is entitled to $9,332.88 in damages on Contract 1272–304 as an offset against the $22,873.09 which it owes NFO on this contract.

■ Contract 1124–589 called for delivery of 100,000 bushels of No. 1 white wheat by September 16, 1972, at $1.59 a bushel. By December 1, 1972, NFO had shipped 71,224 bushels, leaving a balance due of 28,776 bushels. Coast made payments on the early shipments totaling $30,233.03. The parties agree Coast owed NFO an additional $74,577.54. The first payment Coast failed to make was due October 2, 1974, which was more than two weeks after the final delivery date under the contract. Coast cancelled the contract on November 1, 1972. Even though Coast withheld more than the amount of damages, I hold that NFO's duty to deliver continued and that Coast is entitled to damages. The U.S.D.A. price for the grain on September 18, 1972, was $2.12. Coast is entitled to $15,251.28 in damages on Contract 1124–589 as an offset against the $74,577.54 which Coast owes NFO on this contract.

Contract 1269–303 called for delivery of 100,000 bushels of # 1 dark Northern Spring 14% Protein wheat by September 16, 1972, at $1.94 a bushel. Through October 11, 1972, NFO had shipped 63,341 bushels, leaving a balance due of 36,659 bushels. Coast made payments on the earliest shipments totaling $8,800.66. The parties agree that Coast owed an additional $87,887.58. The first payment Coast missed was due September 20, 1972, which was after the final delivery date under the contract. Coast was privileged to cancel the contract on October 18, 1972.

Even though Coast withheld more than the amount of damages, NFO still was under a duty to deliver, and Coast is entitled to damages for the failure to deliver. The U.S.D.A. price for the grain on September 18, 1972, was $2.39 a bushel. Coast was entitled to $16,496.55 in damages on Contract 1269–303 as an offset against the $87,887.58 which Coast owed NFO on this contract.

NFO raised other contentions on this and other contracts, all of which are without merit. It contended that under ORS 72.6120(3), either Coast's acceptance of late deliveries or its demand for future performance reinstated the contracts, which afforded NFO the privilege to cancel later.

■ The acceptance of nonconforming installments reinstates a contract only in the absence of seasonable cancellation. Here Coast seasonably cancelled. See Uniform Commercial Code § 2–612, Comment 7. Coast did not seek future performance on contracts which it had previously cancelled and therefore Coast did not reinstate them.

NFO also contends that it was relieved of its duty to deliver because under ORS 72.5110(1), "tender of payment is a condition to the seller's duty to tender and complete any delivery." There is no merit in this contention.

■ Uniform Commercial Code § 2–511, Comment 1, explains that that provision "integrates this section with the language and policy of the section on delivery in several lots which call for separate payment." Under ORS 72.6120, which concerns delivery in several lots, failure to pay does not relieve the seller of its duty to deliver, *Gulf, supra.* ORS 72.6120 is controlling on installment contracts, and ORS 72.5110(1) is inapplicable.

Contract 1379–327 called for delivery of 100,000 bushels of # 1 dark Northern Spring 14% Protein wheat by December 1, 1972, at $2.15 a bushel. Through November 4, 1972, NFO shipped 11,088, leaving a balance due of 88,912 bushels. Coast's first payment was due September 28, 1972. It made no payments, and the parties agree Coast owed NFO $18,162.35. NFO cancelled the contract on November 1, 1972, and Coast cancelled it on November 9, 1972, effective November 2, 1972.

■ NFO contends that it was entitled to cancel the contract because Coast refused to give adequate assurances for future performance. I need not reach the questions of whether NFO's demand for assurances

was proper or whether Coast gave adequate assurances because NFO did not have reasonable grounds for insecurity, a prerequisite for seeking assurances under ORS 72.-6090. Coast had paid NFO more than $3 million in the first six months of 1972. It had paid NFO $100,000 on a moment's notice in a dispute in March 1972. NFO knew that Coast was ready, willing and able at all times to pay if NFO delivered. NFO had no reason to feel insecure. It knew that if it carried out the contracts which called for shipment of grain at prices much below the then-market prices, Coast stood to make large profits, which would add to Coast's unquestioned willingness and ability to pay.

NFO's cancellation was an anticipatory repudiation under ORS 72.6100. Because of the rising market, the cancellation was a breach of the whole contract, and Coast was entitled to cancel. The U.S.D.A. price for the grain on November 2, 1972, was $2.41 a bushel. Coast is entitled to $23,117.12 in damages on Contract 1379-327 from which $18,162.35, the amount Coast owes NFO, is to be deducted.

The barge contract, Contract 1495-643, called for delivery of 50,000 bushels of # 1 white wheat by November 1, 1972, at $1.99 a bushel. NFO made no deliveries and Coast made no payments. Coast cancelled the contract on November 1, 1972.

NFO contends that it was entitled to refuse to deliver under the contract either because Coast had said it would not pay for future shipments or because Coast had failed to pay for grain shipped under other contracts.

The communications to which NFO refers did not indicate that Coast would not pay for future deliveries. On the contrary, Coast never refused to pay for future deliveries. Coast's communications always said either that it would perform if NFO did or that Coast intended to exercise its rights under ORS 72.7170 to withhold payments for damages already accrued.

Under the circumstances here, NFO was not entitled to refuse delivery on the barge contract because of Coast's failure to pay for grain delivered under other contracts. *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc., supra* 261 Or. at 490, 495 P.2d 744. NFO's failure to deliver substantially impaired the value of the contract for Coast, and Coast was entitled to cancel. The U.S.D.A. price for the grain on November 1, 1972, was $2.46 a bushel. Coast is entitled to $23,500 in damages on the barge contract.

The parties agree that Coast was entitled to cancel Contract 1279-309, but disagree on the date for damages. Coast contends that it is entitled to $44,273.95 in damages based on the grain price on the date it cancelled. NFO contends that Coast is entitled to only $33,527.56 in damages, based on the grain price on the first business day after the last day of delivery under the contract. I agree with the NFO contention, and I hold that Coast is entitled to $33,-527.56 in damages on Contract 1279-309.

On the remaining 18 contracts, which called for delivery after November 1, 1972, NFO contends that it was entitled to cancel because Coast failed to give adequate assurances. I have already discussed this contention and held that there is no merit to it. Coast had adequate means to pay for its purchases and was willing to pay if NFO delivered. Coast was willing to post a bond or establish an escrow account if NFO would deliver or if it would give assurances or respond in damages for its default. This NFO was either unwilling or unable to do. Coast's failure to pay on previous contracts was not a ground for insecurity, *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc., supra* at 492, 495 P.2d 744. NFO's cancellation was an anticipatory repudiation, and Coast was entitled to cancel and is entitled to $216,675.77 in damages for breach of these 18 contracts.

NFO on the first 22 contracts is entitled to receive $174,064.07 by stipulation, $6,144.00 on the applications, $604.03 on mathematical errors in Coast's favor, and $276,314.40 for grain delivered but not paid for, for a total of $457,126.50.

Coast on the first 22 contracts is entitled to receive $180,807.15 by stipulation, $147,-

351.83 in damages on the eight contracts which called for delivery before November 1, 1972, and $216,675.77 in damages for the 18 contracts which called for delivery after November 1, 1972, for a total of $544,834.75. In addition, Coast is entitled to $26,340.15 for breach of the storage agreement, for a total of $571,174.90, which is $114,048.40 more than is due NFO.

The parties have agreed that for ease of computation, interest is to start at November 1, 1972, regardless of the date when the obligation arose. I hold that interest is to be determined in the following manner: for each separate contract, the amount due each party is to be determined; the smaller amount is to be deducted from the larger amount. The difference shall bear interest at six per cent per annum beginning on November 1, 1972. *Westinghouse Electric Corporation v. CX Processing Laboratories*, 523 F.2d 668, 680 (9th Cir. 1975).

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Counsel shall submit a proposed judgment in accordance with this opinion.