**In re W. Gail SMITH dba Gail Smith Development Co., Debtor.**

**W. Gail SMITH, Plaintiff,**

v.

**O'MARA ENTERPRISES, INC., Defendant.**

**Bankruptcy No. 2–80–04322. Adv. No. 2–80–0621.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Feb. 16, 1989.

See also, Bkrtcy., 79 B.R. 297.

**332**

William B. Logan, Jr., Luper Wolinetz Sheriff & Neidenthal, Columbus, Ohio, for plaintiff W. Gail Smith.

James C. Carpenter, Carlile Patchen Murphy & Allison, Columbus, Ohio, for defendant O'Mara Enterprises, Inc.

Stanley G. Burech, Burech & Sargus, St. Clairsville, Ohio, for D. William Davis, Trustee.

D. William Davis, Bellaire, Ohio, Trustee.

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW ON COMPLAINT
FOR DECLARATORY JUDGMENT

BARBARA J. SELLERS, Bankruptcy Judge.

## I. JURISDICTION

This matter is before the Court following the plaintiff's request for declaratory judgment and money damages. D. William Davis, successor-Trustee ("Trustee") brought this adversary proceeding on behalf of the bankruptcy estate of W. Gail Smith ("Smith"). The Trustee seeks to recover money damages from the defendant O'Mara Enterprises, Inc. ("O'Mara") for royalties due Smith under agreements executed by Smith and O'Mara. O'Mara answered the complaint and the matter was tried to the Court.

The Court has jurisdiction in this proceeding under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. The parties indicated in their pretrial statements that this action is a non-core proceeding, however both parties consented, at trial, to this Court entering a final order of judgment.

## II. BACKGROUND

### A. *Preliminary Facts*

O'Mara was incorporated in West Virginia in 1969. Its principal place of business is Steubenville, Ohio. O'Mara operates a total of sixteen (16) Bonanza Steakhouse restaurants located in West Virginia, Pennsylvania and Ohio. Presently, the principal shareholders in O'Mara are Timothy, Vincent, Michael and James Patrick O'Mara. Prior to forming their own company, three of the O'Mara brothers worked as store and regional managers in Burger Chef restaurants owned and operated by W. Gail Smith.

When the O'Mara brothers decided to leave Smith's employ to start their own business, Smith apparently asked to be involved. Recognizing their need for capital and aware of Smith's financial worth, the O'Mara brothers accepted Smith's services and elected him the first president and chief executive officer of O'Mara Enterprises. Smith, in return, provided financial assistance by agreeing to guarantee equipment and store leases. In addition, Gail Smith Development Co. ("Smith Development"), of which Smith was the sole proprietor, was to manage all of the accounting functions for O'Mara.

To compensate Smith for his services, O'Mara and Smith executed eleven separate royalty agreements and allegedly one "master" royalty agreement. The agreements provide that Smith is to receive royalties based upon the gross sales receipts of the restaurants. The parties disagree,

however, as to the circumstances under which Smith is entitled to those royalties.

In addition to his involvement in O'Mara, Smith had several other business interests. By 1979 many of those interests were experiencing financial strain. As a result, Smith's participation in O'Mara decreased. On June 6, 1979 Smith ceased serving as president and chief executive officer of the company. Smith remained a director of O'Mara until September, 1980 when all of his responsibilities were terminated.

While serving as president and chief executive officer of O'Mara, Smith personally committed, or directed others to commit on his behalf, several acts which caused the company to incur substantial financial obligations. Specifically, in 1979 and 1980, Smith, in conjunction with Terry Thompson, comptroller, improperly diverted into the bank account of Smith Development checks intended to satisfy O'Mara's tax withholding liabilities. The total sum of the checks diverted was $498,147.63. O'Mara Enterprises did not become aware of the diversion until August 24, 1980 when Tim O'Mara was contacted by an agent of the Internal Revenue Service.

In 1977, Smith executed certain leases with Tri–Continental Leasing, Inc. ("Tri–Continental") for restaurant equipment to be used in restaurants owned by Sanoma Foods, a company with which Smith was involved, but in which O'Mara had no ownership interest. In order to obtain the equipment leases, Smith executed unauthorized guarantees for those leases on behalf of O'Mara. When Sanoma Foods became insolvent, Tri–Continental brought suit against O'Mara on the guarantees. O'Mara settled the Tri–Continental suit for $27,417 plus a participation right in O'Mara's suits against certain banks for the improper handling of O'Mara's tax deposit checks. The participation right could potentially cost O'Mara an additional $15,000.

Finally, Smith originally loaned money to O'Mara through another of his unrelated companies, Smith–Eckard Corp. ("Smith–Eckard"). In 1975 or 1976, Smith–Eckard fell behind in making its state sales tax payments. Consequently, Smith directed Terry Thompson to begin drawing money from the O'Mara accounts with the apparent understanding he would draw funds until Smith–Eckard was repaid the money it originally advanced. However, Smith continued to draw funds from the account until Smith–Eckard owed O'Mara $174,183. In September of 1980 Smith repaid O'Mara $70,000 of that amount.

### B. *Legal Proceedings*

On November 12, 1980, Smith filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The schedules list O'Mara as an unsecured creditor for $396,000. The schedules indicate that O'Mara's claim is disputed, contingent, unliquidated, and subject to setoff. Smith also listed in his schedule of assets an account receivable from O'Mara, representing unpaid royalties of approximately $114,333. The estate has not received any royalties since the filing for relief.

On December 23, 1980, Smith, as debtor-in-possession, filed the present adversary proceeding against O'Mara. Smith's complaint asked for royalties earned pursuant to eleven agreements made with O'Mara. The complaint recites that the eleven agreements provide for a two percent royalty on the gross sales receipts of the eleven restaurants. It states that through December 31, 1980, Smith agreed to take a one percent royalty, but after that date the full royalty of two percent is due.

The complaint asks for a judgment declaring the royalty agreements to be in full force and effect. It also asks for an accounting of all gross sales for each restaurant subject to a royalty agreement. And finally, the complaint asks for a monetary judgment against O'Mara in the amounts due under the royalty agreements from the date Smith's petition was filed.

On February 25, 1981, O'Mara filed an answer to the complaint. O'Mara admitted that it had entered into the royalty agreements with Smith. However, O'Mara stated that because of Smith's bankruptcy filing, Smith could not provide the consideration required by the agreements. There-

fore, O'Mara asked the Court to dismiss the action.

On May 20, 1982, Smith converted this case to a case under Chapter 7 of the Bankruptcy Code and Gary M. Hallock was appointed Trustee.

On April 22, 1983, Trustee Hallock applied to the Court to settle this adversary proceeding. The settlement proposed a $2,000 payment from O'Mara and a waiver of its rights to any distribution from the estate, in return for Smith's interest in O'Mara and dismissal of the adversary proceeding. Objections to the settlement were asserted by Heritage Bank (now Bank One of Eastern Ohio). On October 27, 1983, after hearing, a former judge of this court denied Trustee Hallock's application to compromise this action.

On August 13, 1985, Trustee Hallock resigned and the court appointed D. William Davis as the successor trustee.

On July 11, 1986, O'Mara filed a motion seeking Summary Judgment. That motion was denied by the Court on August 17, 1987.

On July 1, 1987, the Court appointed D. William Davis as attorney for the estate. On July 14, 1987, the Court denied a request to permit counsel for Bank One to assist the Trustee in pursuing the estate's claim against O'Mara. On September 27, 1987, the Court approved the appointment of Stanley G. Burech as co-counsel for this adversary proceeding.

Subsequently, the parties filed pre-trial statements with the Court. On the 17th and 18th of August, 1988, a trial was conducted by the Court in Steubenville, Ohio.

## C. *Statement of the Case*

The Trustee contends that under each of the individual royalty agreements, the estate is owed royalties since the filing of the petition in November of 1980. Through 1987, the Trustee calculates the total of those royalties at $1,156,459.00. This figure does not include royalties owed for 1988 because O'Mara was unable during discovery to supply information regarding gross sales receipts for that period. The Trustee requests an accounting of those receipts when available.

The Trustee also contends that the estate should be awarded pre-judgment interest from the date the royalties were due. According to the Trustee, accrued interest on the unpaid royalties is $496,336.00. Therefore, through 1987, the total amount due the estate is $1,652,795.

In response, O'Mara argues that Smith's breach of his fiduciary duties entitled it to terminate the royalty agreements. O'Mara also contends that the "master" royalty agreement was to end by its own terms when Smith's duties as chief executive officer and president ended. That event occurred prior to November 1980 when Smith filed his petition for relief. Alternatively, O'Mara contends that any royalties owed to Smith are subject to set off against damages suffered by O'Mara as a result of Smith's wrongful conduct. O'Mara argues that the amount of such damages far exceeds any royalties owed to Smith. Therefore, the Trustee is not entitled to recover anything for the estate. Finally, O'Mara asserts that general principles of equity bar any recovery by the Trustee.

In response to O'Mara's arguments, the Trustee contends that where there are separate contracts, the breach of a party in one contract does not justify the breach of another separate contract by the other party. Further, the Trustee argues that the royalty agreements did not terminate by their own terms, but instead remain enforceable. And finally, the Trustee argues that O'Mara has no right to set off the post-petition claims of the estate against damages resulting from the pre-petition actions of Smith.

## III. ISSUES PRESENTED

Given the specific facts of this case, the Court is presented with the following issues:

A. Royalty Agreements

1. Whether the separate royalty agreements or the "master" royalty agreement controls Smith's entitlement to royalties;

2. Whether the royalty agreements terminated when Smith no longer served as president and chief executive officer of O'Mara;

3. Whether Smith's improper diversion of O'Mara funds constituted a breach of his fiduciary duty which terminated the royalty agreements between Smith and O'Mara.

B. Setoff of Claims

Whether O'Mara's obligation for royalties is subject to setoff against Smith's obligation to O'Mara for breach of his fiduciary duty.

C. Equity Argument

Given improper or criminal behavior by Smith, whether the Trustee is equitably estopped from demanding royalty payments.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. *Interpretation of Royalty Agreements*

■ Initially, this Court must determine whether the payment of royalties is controlled by the language contained in the eleven separate royalty agreements, each involving an individual restaurant, or by the "master" royalty agreement signed by Smith on August 17, 1972. The Trustee argues that the individual agreements control and that the master agreement is not enforceable because it was neither executed with the proper authority nor subsequently ratified by the necessary officers. The Trustee further argues that where the terms of the agreements conflict, the provisions of the earlier agreement are superceded by the provisions of the latter. On the contrary, O'Mara argues that the language of the "master" agreement controls and that its obligation for payment of any royalties terminated under the provisions of that agreement. According to O'Mara, Smith's right to receive royalties existed only while he served as chief executive officer.

Given the testimony presented at trial, the Court finds that the payment of royalties is dictated by the language found in the separate royalty agreements and not the master royalty agreement. The Court is compelled to reach this conclusion even without passing on the legal significance of Smith's execution of the master agreement in a dual capacity absent proper authority or subsequent ratification. O'Mara's actions clearly establish its intent to be bound by the terms of the separate royalty agreements.

Specifically, the agreements provide Smith with compensation for having already provided financial assistance. This is evidenced by the fact that discussion of Smith's obligation under the agreements is in the past tense. Further, O'Mara stopped entering into the agreements when it felt it was no longer receiving financial assistance from Smith. And, O'Mara only paid royalties on the eleven stores for which individual agreements existed, not on all sixteen stores. Finally, Smith continued to receive royalties after June of 1979 when Timothy O'Mara became chief executive officer. The Court also finds a statement made by Timothy O'Mara to be relevant to this matter. Mr. O'Mara testified that the company stopped paying royalties to Smith "because of what he did to us—he almost put us in bankruptcy;" not because of what he no longer did—serve as chief executive officer.

■ Having concluded that the payment of royalties is controlled by the individual agreements, O'Mara's argument that the obligation to pay royalties terminated when Smith no longer served as chief executive officer must fail. None of the individual agreements contain language that royalties are contingent upon Smith's continued service as chief executive officer. The Court notes, however, that given the "and/or" language appearing in the "master" royalty agreement, it seems evident Smith would also be entitled to royalties under the master agreement even though he no longer served as chief executive officer of O'Mara.

Despite the conclusions reached above, the question remains as to whether Smith's wrongful behavior terminated the royalty agreements. O'Mara submits that regard-

less of which agreement controls, Smith's improper diversion of O'Mara funds constituted a breach of his fiduciary duty and thereby terminated O'Mara's obligation. The Trustee argues that Smith's wrongful conduct, while impacting on O'Mara, was unrelated to the obligations set forth in the royalty agreements. The Trustee contends that where separate contracts exist between the parties, the breach of one of those contracts by a party does not justify a breach of another contract by the other party.

■ Clearly Smith's conduct constituted a breach of his fiduciary duty; however, such breach does not excuse O'Mara's obligation under the royalty agreements. Where there exists two sets of obligations or contracts, the breach or non-performance of one contract does not justify the aggrieved party in refusing to perform another separate and distinct contract. *National Farmers Organization v. Bartlett & Co., Grain*, 560 F.2d 1350, 1357 (8th Cir.1977); *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc.*, 261 Or. 480, 495 P.2d 744, 749 (1972); Annotation, 27 ALR 1157 (1923). *See also* 6 Williston On Contracts § 887 D (3d ed. 1962 & Supp.1988); 3A Corbin On Contracts § 696 (1960); Restatement (Second) of Contracts § 240 comment b.

In the present case, each party's obligation arose under a separate and distinct agreement. While Smith owed O'Mara obligations by reason of his capacity as its president and chief executive officer, performance of these obligations were not consideration for the royalty agreements. Smith's duty to manage O'Mara's accounting functions and his duty to serve as chief executive officer were distinct from his duty under the royalty agreements to provide O'Mara with financial assistance in opening restaurants. And, O'Mara's obligation to pay royalties arose solely as a result of Smith providing such financial assistance. Therefore, Smith's breach of his fiduciary duty did not terminate O'Mara's obligations under the royalty agreements.

## B. *Setoff of Claims*

■ Having determined that the royalty agreements have not terminated, under contract law, the next question raised is whether O'Mara's obligations under those agreements can be set off against Smith's obligations to O'Mara. O'Mara contends that any amount owing to Smith is subject to setoff of an amount equal to the damages it suffered as a result of Smith's wrongful conduct. O'Mara claims the amount of setoff damages far exceeds any royalties owed, and therefore the Trustee should recover nothing. The Trustee concedes that the pre-petition amount Smith owes O'Mara as a result of Smith's improper behavior exceeds Smith's pre-petition claims for royalties and is appropriate for setoff. However, the Trustee argues that O'Mara cannot offset its pre-petition claims due from Smith against the post-petition claims of the estate.

The right to setoff is governed by section 553 of the Bankruptcy Code which provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

Critical to the right of setoff is the existence of mutual debts. Although not defined in the Code, mutuality is generally construed to mean "something must be 'owed' by both sides." 4 Collier on Bankruptcy § 553.04 (15 ed.1988). This requirement poses problems where debts arise after the petition is filed.

■ Under section 553, the rights of the parties are fixed for purposes of adjustment at the time the case is commenced. To be eligible for setoff, both the claim of the creditor against the debtor and the debt of the debtor to the creditor must have arisen and "be owed" prior to the commencement of the case. *Armstrong v. Isbell (In re Isbell)*, 27 B.R. 926 (Bankr.W.D.

Wis., 1983). Claims arising after the commencement of the case lack the requisite mutuality for setoff because the post-petition trustee or debtor-in-possession is a different legal entity from the pre-petition debtor. 4 Collier on Bankruptcy § 553.08[1] (15 ed.1988); *see also In re Springfield Casket Co.*, 21 B.R. 223, 228 (Bankr.S.D.Ohio 1982). In *Hill v. Farmers Home Administration* (*In re Hill*), Judge Brister held that "a post-petition obligation may not be set off against a pre-petition obligation of the debtor, because there is no mutuality of obligation." 19 B.R. 375, 380 (Bankr.N.D.Texas 1982); *see also In re Braniff Airways, Inc.*, 42 B.R. 443, 449 (Bankr.N.D.Texas 1984). Judge Brister premised his statement on the fact that the pre-petition debtor and the debtor-in-possession are separate and distinct entities. *Id.* at 380. That distinction is more evident in the present case as the debtor and the Chapter 7 Trustee are different persons. Therefore, the Court must conclude that O'Mara cannot set off its post-petition obligations to the estate against Smith's pre-petition obligations to O'Mara. The right to setoff is denied because the obligations lack the requisite mutuality.

### C. *Equity Argument*

The final issue presented by this case concerns the authority of a bankruptcy judge to correct an apparently inequitable situation which results solely from the application of correct legal principles. O'Mara argues that the Trustee should be equitably estopped from receiving royalties because of Smith's improper or criminal behavior. To do otherwise, O'Mara contends, would be "shocking to the community's conscience."

O'Mara argues that the Bankruptcy Court, as a court of equity, requires the party seeking relief to come before the Court with "clean hands." At trial, counsel for O'Mara went to great lengths to demonstrate the extent of Smith's wrongful conduct. O'Mara argues that the Trustee cannot wash away the stains of such conduct merely because of his appointment as trustee.

■ The Trustee has the capacity to sue and be sued. 11 U.S.C. § 323. The Trustee is also empowered to commence and prosecute any action or proceeding on behalf of the estate. Bankruptcy Rule 6009. Collier's notes that:

Such actions will fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the estate under section 541, and (2) those brought under one or more of the trustee's avoiding powers. With respect to the former, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. *The trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.*

4 Collier on Bankruptcy § 323.02[4] (15th ed.1988) (emphasis added). *See also Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966). Clearly, the present action falls in the former category. Therefore, the Trustee is subject to the same defenses as could have been asserted by O'Mara had this action been prosecuted by Smith.

■ The Supreme Court of the United States has held that "for many purposes courts of bankruptcy are essentially courts of equity and their proceedings inherently proceedings in equity." *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). The equitable principles governing the exercise of bankruptcy jurisdiction concern the meaning and application of Bankruptcy Code provisions. *Pepper v. Litton*, 308 U.S. at 304, 60 S.Ct. at 244. Further, in a non-core proceeding the bankruptcy court will apply such equitable principles as would be applied by a state court deciding the related matter. Therefore, in this contract action between two parties doing business in Ohio, O'Mara may assert, and the Trustee is subject to, those equitable principles recognized by Ohio courts in contract actions.

■ The Courts of Ohio recognize and apply the "clean hands" doctrine raised by O'Mara. However, this maxim of equity is generally argued as a defense where

the plaintiff is seeking equitable relief. In the present case, the Trustee brought a contract action at law. It was O'Mara, the defendant, that initially invoked this Court's equity jurisdiction. While such a fact pattern represents the mirror-image of cases reported, this Court does not believe the sequence in which equity jurisdiction was invoked is critical. The purpose for the doctrine is to promote public policy by protecting the basic integrity of the courts. 27 Am.Jur.2d Equity § 136. Further, as noted above, bankruptcy courts are concurrently courts of law and equity. Therefore, a party subject to equitable defenses remains so, despite initially seeking only a remedy at law.

Application of the maxim to bar recovery requires that the plaintiff's wrongful conduct arise in connection with the same transaction which is the subject matter of the litigation. *General Excavator Co. v. Keystone Driller Co.*, 62 F.2d 48 (6th Cir. 1932) *aff'd* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). The issue then is how broadly "transaction" should be construed.

It is clear that the royalty agreements between Smith and O'Mara, the contract under which Smith Development provided financial services to O'Mara, the loans between Smith–Eckard and O'Mara, and the unauthorized guarantees of Sanoma Foods' leases were all distinct, separate legal relationships. In the technical sense such arrangements were not part of the same transaction.

This Court, however, believes that when the equitable powers of the Court are invoked, strict dependance upon literal or technical legal analysis of the various relationships between these two parties misses the point. In the larger sense, these transactions are inter-related and arise from the subject matter of this litigation. The royalty agreements were part of an arrangement whereby Smith contributed his financial means to O'Mara's business and received in return not only a share of O'Mara's profits, but also a position of fiduciary responsibility in the new corporation. Smith's actions violated, in an egregious manner, the duties and responsibilities of the fiduciary position he assumed as part of the royalty package. Indeed, without the authorization to obligate O'Mara which was derived, in part, from that status, some of Smith's malfeasance would not have been possible.

In conclusion, the Court finds that Smith's illegal and dishonest actions involved misuse of his position in O'Mara. That position, in turn, came about through the transactions which underlay the royalty agreements. In that larger sense, the acts of malfeasance and the benefits from the royalty agreements are related.

Having found that Smith's actions and the royalty agreements have the relationship necessary for the application of equitable principles, the Court finds that it is appropriate to apply the maxim "he who comes into equity must come with clean hands." As the perpetrator of significant fraud against O'Mara, Smith lacks the requisite "clean hands" to obtain relief in a court of equity. Smith's deficiencies are imputed to the Trustee, as the legal successor to his interests. *Guinee v. Heydt (In re Wilson)*, 90 B.R. 208 (Bankr.E.D.Va. 1988).

Based upon the foregoing, the Trustee's demand for money damages should be, and the same is, hereby denied. Consistent with the Court's findings, judgment shall be entered in this adversary proceeding in favor of the defendant.

IT IS SO ORDERED.