**RANGER CONSTRUCTION COMPANY, Plaintiff,**

v.

**DIXIE FLOOR COMPANY, INC., Defendant.**

**Civ. A. No. 76–618.**

United States District Court, D. South Carolina.

April 21, 1977.

Pope D. Johnson, III, Thomas E. McCutchen, Whaley, McCutchen & Blanton, Columbia, S. C., for plaintiff.

Glenn Bowers, Nexsen, Pruet, Jacobs & Pollard, Columbia, S. C., for defendant.

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

HEMPHILL, District Judge.

This action arises from a contract between the parties under which the defendant was to furnish all materials and labor for the installation of resilient flooring in the Clinical Science Building at the Medical University of South Carolina at Charleston. The complaint alleges that defendant refused to perform the work specified in the contract for the agreed price of $52,601.00 and that as a result, the plaintiff was required to enter into a second contract to have the flooring installed at a substantially higher cost.[1] The plaintiff is seeking judgment against defendant for the addi-

---

1. Article XV of the contract gives the contractor express authority to substitute a sub-contract or in the event of a default in behalf of an original sub-contractor. Article XV reads:

(a) Should Sub-contractor at any time breach this agreement or fail to prosecute said work with promptness, diligence and efficiency, or fail to perform any of the re-

tional amount which it alleges it was required to pay to have the contract performed, $22,268.00.

The defendant, in its answer, admitted that there was a contract between the parties, that the copy of the contract attached to the complaint was a true and correct copy, and that it had refused to perform its work under the subcontract. However, the defendant argues that its actions were justified in that the plaintiff had wrongfully withheld payment for work which the defendant had performed under a separate and distinct contract on a job in North Carolina.

The defendant alleges that shortly before it entered into the contract in issue, it had entered into another similar contract with the plaintiff which was completed in Hickory, North Carolina, on May 7, 1974. Thereafter the plaintiff, without apparent justification, refused to make payment as due under the contract, and, in order to collect the same, the defendant was forced to bring an action against the plaintiff in the United States District Court for the District of North Carolina and reduce its claim to judgment. Defendant finally received payment under this prior contract on June 7, 1976.

In April 1975, the plaintiff requested that the defendant begin work under the present contract. The defendant contends that as a result of the plaintiff's refusal to pay under the North Carolina contract, the defendant had substantial doubt as to both the plaintiff's ability and willingness to pay

it for any performance it might render on the South Carolina contract. Accordingly, the defendant requested that the plaintiff provide it with assurance of performance and alleges that the plaintiff failed to do so in a satisfactory manner.

■ It is the defendant's position that the plaintiff's breach of the North Carolina contract constituted "reasonable grounds for insecurity" under § 2–609 of the Uniform Commercial Code (§ 10.2–609 of the S.C. Code Ann.) Section 10.2–609 of the S.C. Code reads:

Right to adequate assurance of performance.

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

quirements hereof, Contractor may without notice (or, if notice be required by law, then after forty eight hours written notice by registered mail addressed to Sub-contractor at P. O. Box 2015, Jacksonville, Florida 32201 or by posting in some conspicuous place on the job) proceed as follows:
1. Provide such materials, supplies, equipment and labor as may be necessary to complete said work, pay for same and deduct the amount so paid from any money then or thereafter due Sub-contractor, or
2. Terminate the employment of Sub-Contractor, enter upon the premises and take possession, for use in completing the work, of all the materials, supplies, tools, equipment and appliances of the Sub-contractor thereon and complete the work, or have

same completed by others, and be liable to Sub-contractor for no further payment under the agreement until final payment is due and then only if and to the extent that the unpaid balance of the amount to be paid under this Sub-contract exceeds the expense of the Contractor in finishing the work, or

(b) If the amount expended by the Contractor under 1 above or the cost of completing the work under 2 or 3 above exceeds the unpaid balance of subcontract price herein stated, Sub-contractor or his sureties shall pay Contractor such excess within a thirty-day period after submission to Sub-contractor of invoice.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

The defendant urges that summary judgment is inappropriate in this case because under § 10.2–609 the question of whether or not the plaintiff's breach of the former contract was "reasonable grounds for insecurity" under this section constitutes a question of fact which should be reserved for the jury. The plaintiff contends that Article II of the Uniform Commercial Code is not applicable to the transaction which is the subject of the present lawsuit.

Article II of the Uniform Commercial Code is limited in its application to transactions in goods.[2] "Goods" are defined in § 10.2–105 of the S.C. Code to mean "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action". The disputed contract in this action required the defendant to furnish all labor and materials necessary for the installation of resilient flooring in the plaintiff's construction project. There is no doubt that these materials, which consisted of vinyl asbestos tile, sheet vinyl, vinyl baseboards, and cement, constituted goods under the definition provided in § 10.2–105 of South Carolina's version of the Uniform Commercial Code. However, this determination is not dispositive of the issue in this case because the delivery of goods under the contract between the plaintiff and defendant was accompanied by a delivery of services by defendant. "Mixed" contracts, or contracts which involve both goods and services, are not automatically included within the scope of Article II merely because they are partially involved with the exchange of goods.

The leading case on the UCC's applicability to contracts which involve both goods and services is *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974). In *Bonebrake*, the contract involved a sale and installation of bowling alley equipment between a dealer in new and used equipment and the owners of a bowling alley which had been destroyed by fire. The court found that in determining whether a mixed contract for goods and services should be covered as a "sale of goods" under the UCC,

> [t]he test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e. g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e. g., installation of a water heater in a bathroom.)

In *Bonebrake*, the plaintiff's decedent, a Mr. Simek, was engaged in the sale of new and used bowling equipment and employed a man to install the equipment incident to its sale to provide the necessary expertise for its installation. The facts of the case indicate that Mr. Simek was largely involved in the purchase and sale of bowling equipment and owned three storage facilities for such equipment within his native state of Nebraska. The Ninth Circuit characterized the contract as one for the replacement of equipment and therefore the sale of goods under the Commercial Code. It is important to note that Simek was primarily a seller of bowling equipment and apparently, from the facts of the case, installed them as a sideline and as a conve-

---

**2.** The basic scope of Article II of the Uniform Commercial Code is set out, in which the South Carolina version, in § 10.2–102 of the S.C. Code Ann. which reads:

Scope: certain security and other transactions excluded from this Title.—Unless the context otherwise requires, this Title applies to transactions in goods, it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this Title impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers.

nience to his customers. It is also noteworthy that the contractual language involved in *Bonebrake* was that of a contract of purchase and sale.

In the present case the "predominant factor, thrust, or purpose, reasonably stated" of the contract is one for the delivery of services accompanied by the acquisition and furnishing of the necessary materials. The contract involved in this lawsuit is a construction contract, not a contract for the purchase and sale of goods. It is interesting to note that throughout the contract the defendant, Dixie Floor Co., Inc., is not referred to as a materialman but rather as a subcontractor. It is apparent that the plaintiff was not contracting for the materials alone but rather was contracting for the performance of an entire segment of the prime contract. The defendant's responses to interrogatories indicated that the defendant was essentially a service corporation engaged in the installation and construction of flooring. Defendant's response to Interrogatory No. 1 reveals that 75% of their business involved the contracting and installation of flooring. The answer to Interrogatory No. 3 reveals that the defendant did not, at any time relevant to this action, operate as a supplier or maintain a supply house for flooring materials and supplies. The answer to Interrogatory No. 12 indicates that for this particular job the defendant planned to purchase the materials completely from an independent dealer. It is obvious from these facts that the defendant in this case is primarily a service-oriented business which deals in materials as an incident to its performance of services in the construction of floors and flooring. For this reason it is only logical to conclude that the contract in dispute in this case is basically a contract for the performance of services with the sale of the goods necessary to perform those services being incidental to the service contract. Therefore, the Uniform Commercial Code would not be applicable in this case.

This result is in accordance with this court's prior order in the case of *Computer Servicecenters, Inc. v. Beacon Manufacturing Company*, 328 F.Supp. 653 (D.S.C.1970),

*aff'd*, 443 F.2d 906 (4th Cir. 1971) where a contract for the furnishing of data processing services with a separate charge for any accompanying supplies was found to be outside the scope of the Uniform Commercial Code. In that case, as in the present case, the contracting parties knew that it would be necessary to provide certain goods in order for the service contract to be properly carried out. The major thrust of the contract, however, was the performance of services and the contract was therefore characterized as a service contract and excluded from the scope of the Uniform Commercial Code. In *Computer Servicecenters,* this court cited three cases in support of its decision which also served to support the decision in the present case. In *Epstein v. Giannattasio,* 25 Conn.Sup. 109, 197 A.2d 342 (1963), a beauty salon patron who suffered dermatitis and disfigurement from loss of hair allegedly because of treatment with certain products was denied recovery on the grounds of breach of warranty since there was no "sale of goods" within the meaning of the UCC. In *Stagner v. Staples,* Mo.App., 427 S.W.2d 763 (1968) the applicability of the UCC to an agreement for the removal of trees and leveling of ground whereby the worker was to receive fallen timber as part of his compensation was denied. Similarly, in *National Historic Shrine's Foundation, Inc. v. Dali,* 4 UCC RS 71 (N.Y.S.Ct.1967), the court held that an oral agreement by an artist to paint a picture on a television program and to donate it for sale to the public was an agreement for the rendition of services and not a contract for the sale of goods under the UCC. In all these cases, as in the present case, the contracts must be predominantly characterized as service contracts accompanied by an incidental sale of goods.

■ Although the Uniform Commercial Code is inapplicable in this action, the defendant has also alleged a defense under the common law. To begin with, as the plaintiff has argued in its brief, it is a well settled principle of law that the breach of another and separate contract cannot be pled as a defense in a contract action. *Karz*

*v. Department of Professional and V. Standards,* 11 Cal.App.2d 554, 54 P.2d 35 (1936); *Levi v. L. A. Thompson Scenic Railway Co.,* 128 Misc. 465, 218 N.Y.S. 666 (1926); *Rock v. Gaede,* 111 Kan. 214, 207 P. 323 (1922); *Hanson and Parker v. Wittenberg,* 205 Mass. 319, 91 N.E. 383 (1910); *Riley Aircraft Mfg. v. Koppers Co.,* Fla., 99 So.2d 277 (1957); *Hal Roach Studios v. Film Classics,* 156 F.2d 596 (2nd Cir. 1946); *Massey-Harris Co. v. Bernard,* Tex.Civ.App., 84 S.W.2d 1091 (1935); *Northwest Lumber Sales, Inc. v. Continental Forest Products,* 261 Or. 480, 495 P.2d 744 (1972); *Swaner v. Union Mortgage Co.,* 99 Utah 298, 105 P.2d 342 (1940). The defendant argues, however, that the plaintiff's wrongful failure and refusal to pay the defendant under the North Carolina contract was a clear indication of the plaintiff's prospective unwillingness and prospective inability to pay defendant for any performance that it might render in South Carolina, and that it was therefore excused from performance or at the very least was entitled to receive assurance of performance from the plaintiff. The defendant bases its position on the well-recognized principle of prospective failure of consideration which is embodied in § 280 of the Restatement of Contracts. That section reads:

> Manifestation by One Party of Inability to Perform or of Intention Not to Perform.
>
> (1) Where there are promises for an agreed exchange, if one promisor manifests to the other that he cannot or will not substantially perform his promise, or that, though able to do so, he doubts whether he will substantially perform it, and the statement is not conditional on the existence of facts that would justify a failure to perform, and there are no such facts, the other party is justified in changing his position, and if he makes a material change of position he is discharged from the duty of performing his promise.

The comment to § 280 goes on to say, in part,

> A promisor may justly be required to take large risks as to the possibility of

getting what he bargained for in return for his own performance, where this risk is due to circumstances over which the other party has no control, and as to which he has made no warranty or misrepresentation; but where the risk is due to a statement by the other promisor that he will not perform his duty, or even to a statement by him of a doubt whether he will perform it, the risk of failure of consideration is wrongfully imposed and, unless retracted, discharges the other party. What amounts to such a statement is a question of fact.

While there is no South Carolina law dealing directly with this question, the decisions of the courts in other jurisdictions which have directly dealt with this area of the law are in substantial accord with § 280. *E. g., New York Life Insurance Company v. Viglas,* 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936); *Kimel v. Missouri Life Insurance Co.,* 71 F.2d 921 (10th Cir. 1934). Under the theory of anticipatory repudiation, there is a question of fact for the jury involved in determining whether the plaintiff's refusal to pay the defendant under their North Carolina contract constituted a manifestation to the defendant that the plaintiff could not or would not substantially perform his promise under the contract. For this reason, summary judgment in this matter is inappropriate.

Therefore, for the foregoing reasons, plaintiff's motion for summary judgment is denied.

AND IT IS SO ORDERED.