**EPRESENCE, INC., Plaintiff**

v.

**EVOLVE SOFTWARE, INC., Defendant.**

**No. CIV.A.01–40030–NMG.**

United States District Court, D. Massachusetts.

Feb. 27, 2002.

Richard V. Wiebusch, Hale & Dorr, Boston, MA, for Plaintiff.

Jeffrey L. Levy, Peter E. Gelhaar, Donnelly, Conroy & Gelhaar, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

The instant dispute involves an ill-fated contract for the purchase and sale of software programs and services. Plaintiff ePresence, Inc. ("ePresence") has brought claims against Evolve Software, Inc. ("Evolve") for breach of a written contract, breach of a subsequent, oral contract, violation of M.G.L. c. 93A and breach of implied covenants of good faith and fair dealing. The action is in this forum under federal diversity jurisdiction. The plaintiff is a Massachusetts corporation with a principal place of business in Westborough, Massachusetts and the defendant is a California corporation with a principal place of business in Emeryville, California.

Pending before this Court is the defendant's motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Counts I and III of the Complaint on the grounds that the parties' written contract expressly prohibits subsequent oral modifications and contained a California choice of law provision that would preclude a Chapter 93A claim.

## I. Legal Standard

A motion to dismiss for failure to state a claim may be allowed only if the Court can conclusively determine that the plaintiff can prove no facts in support of its claim entitling it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir.1992).

## II. Factual Background

The facts are assumed to be as alleged by the plaintiff. In 1999 ePresence, a directory provider and services company, submitted to several vendors a detailed description of its requirements for a professional service automation system ("PSA"), a software application that would enable it to manage more effectively internal and customer operations. After considering the proposal of several vendors, ePresence selected the PSA of Evolve, ServiceSphere version 2.5 ("Version 2.5"), because it was said to contain three features set forth in ePresence's vendor request: multi-currency, international tax and inter-company capability.

On January 31, 2000, the parties entered into a Software License and Services Agreement ("the Agreement") in which ePresence agreed to purchase licensed programs and maintenance services from Evolve at an annual cost of $540,000. Within 30 days of signing the Agreement, ePresence became responsible for an additional $110,000 in installation and customization services and $2,000 per day for training, additional engineering work and travel expenses.

Approximately one month after it signed the Agreement, ePresence discovered that, although Version 2.5 contained inter-company capabilities, it did not feature multi-currency and international taxation support as represented by Evolve. Evolve assured ePresence that those capabilities would be available in Version 3.0 of ServiceSphere, which was then scheduled for release in August, 2000.

Although Evolve's software program lacked certain requisite capabilities, ePresence agreed to move forward with installing Version 2.5 based upon Evolve's assurances that any delays would not affect the overall timing of the implementation of the PSA. In June 2000, however, Evolve informed ePresence that Version 3.0 would not meet ePresence's multi-currency and international tax requirements. Because of Evolve's continuing problems, ePresence executives met with Evolve's management in California on July 6, 2000 to discuss the status of the project. Evolve assured ePresence that, notwithstanding the negative news conveyed the preceding month, Evolve would have multi-currency and international taxation features in Version 3.0 and it offered a slide presentation to buttress its claims.

Based upon such reassurances, ePresence agreed to delay the full implementation of its PSA until September, 2000. In August 2000, Evolve completed an initial public offering of its stock at which time it touted its relationship with ePresence. Almost immediately, ePresence asked Evolve to cease making any such references to their business relationship.

Problems soon again began to brew. In August 2000, ePresence learned that, although Version 3.0 contained multi-currency and international taxation features, it now lacked inter-company capabilities, a feature available in Version 2.5 and critical to support projects on which ePresence's multiple subsidiaries worked collaboratively. Evolve informed ePresence that a fully

functional PSA would not be available for another year.

At that time, the executives of Evolve and ePresence conducted a conference call to discuss the dispute. Someone on behalf of Evolve promised ePresence that it would build the required capabilities or refund all monies already paid under the contract and pledged to submit a preliminary report with respect to Evolve's proposed solution. Evolve confirmed the oral promise to ePresence by letter dated August 29, 2000 and ePresence relied upon those representations when it decided not to terminate the relationship.

Shortly thereafter, communications between the parties ceased. Evolve failed to deliver to ePresence a preliminary report outlining its proposed resolution of the dispute and ePresence's attempt to contact Evolve were unsuccessful. On September 8, 2000, Evolve's CEO acknowledged that his company had done a poor job and reaffirmed his promise to repay all monies received theretofore if Evolve could not address the continuing problems with its PSA.

On November 2, 2000, ePresence informed Evolve that it would accept its refund offer because of Evolve's ongoing inability to design and implement a system with the requisite capabilities. In response, Evolve stated that it intended to reduce its refund to reflect the cost of its implementation services already performed on ePresence's behalf. On November 22, 2000, Evolve emailed ePresence the terms of its "best and final offer": $150,000.

ePresence found Evolve's offer unacceptable because, under the Agreement, ePresence had paid Evolve over $680,000 and Evolve had billed an additional $84,000 for training and other expenses. On December 1, 2000, Evolve offered by email to refund to ePresence approximately $365,000 by June 30, 2001, but again, because of the broken promises, ePresence refused the offer.

The parties have attempted to resolve the instant dispute with little success. ePresence steadfastly maintains that it has a clear and enforceable oral contract entitling it to the promised refund in full.

## III. Discussion

### A. Choice of Law Principles

■ This Court must initially determine whether Massachusetts or California law governs the instant dispute. Where there are conflict of law issues, a federal court sitting in diversity jurisdiction applies the substantive law of the forum state, including that forum's choice-of-law principles. *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477,(1941).

If the parties have determined by contract what law governs "a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement." *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991); *see also* M.G.L. c. 106, § 1–105(1). Indeed, absent exceptional circumstances or a manifest public policy conflict, Massachusetts courts honor contractual choice-of-law provisions. *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.,* 986 F.2d 607, 610 (1st Cir.1993).

In the instant dispute, the Agreement includes a choice-of-law clause that reads:

[t]his Agreement and all matters arising out of or relating to this Agreement shall be governed by the laws of the State of California, excluding its conflict of law provisions.

Despite the explicit language of the Agreement, ePresence contends that the choice-of-law clause is inapplicable because Evolve breached a subsequent and independent oral contract. The language of the parties' choice-of-law clause, however, brooks no interference; it applies to all matters that *arise out of* or *relate to* the Agreement. Clearly, Evolve's alleged promise to refund all monies paid pursuant to the Agreement "relate(s)" to the Agreement. Nor has ePresence raised any public policy reason that would compel this Court to disregard the plain language of the contract. Accordingly, California law governs the instant dispute.

## B. Application of the California Commercial Code

The Agreement concerns both the sale of goods (i.e., software programs) and services (i.e., support and implementation). Because the California Commercial Code ("CCC") derives from and largely mirrors the Uniform Commercial Code ("UCC"), a traditional analysis of the latter will suffice to determine whether the former applies to this case. *See generally In re Cybernetic Services, Inc.*, 252 F.3d 1039 (9th Cir. 2001); *China Nat. Metal Products Import/Export Co. v. Apez Digital, Inc.*, 141 F.Supp.2d 1013 (C.D.Cal.2001). Such an analysis requires that this Court consider whether the goods or the services dominate the Agreement. *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir.1985); *Greentree Software, Inc. v. Delrina Technology, Inc.*, 1996 WL 183041, *3 (N.D.Cal.1996). As the Agreement's price terms make plain, the software programs themselves were the essence of the Agreement. Therefore, the CCC applies to the parties' transaction.

## C. Count I: Breach of Oral Contract

ePresence contends that in addition to the Agreement of January 31, 2000, the parties entered into a second, oral contract in the fall of 2000 in which Evolve offered (and ePresence eventually accepted) a full refund of the amounts paid by ePresence under the Agreement. Evolve argues, for its part, that such an oral modification is precluded by Section 8.11 of the Agreement which provides, in pertinent part:

[t]his Agreement may not be modified or amended except in a writing signed by a duly authorized representative of each party. No other act, document, usage or custom shall be deemed to amend or modify this Agreement.

ePresence asserts that the parties subsequent contract was not an oral modification of the Agreement, but rather a separate, oral contract concerning the refund of ePresence's money, a discrete and separate matter.

ePresence's arguments are unavailing. The Agreement governs the method of payment and remedies available in the event that there is a breach of warranty by Evolve.[1] Evolve's alleged promise to refund ePresence's money is a modification or, at the very least, an elaboration of the remedies available to ePresence and is therefore an oral modification of the Agreement.

### 1. Section 2–209(2) of the California Commercial Code

Section 2–209(2) of the CCC, which governs oral modifications of written contracts, provides that "a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded..." Although

---

1. In Section 5.3, the Agreement provides that "if Evolve is unable to make the Program operate as warranted, Customer shall be enti- tled to recover the fees paid to Evolve for the particular Program License involved."

Section 2–209(2) appears, on its face, to be conclusive, the meaning of that provision is not as clear-cut when read in conjunction with other provisions in the Code. *See generally*, Frank A. Rothermel, Comment, *Role of the Course of Performance and Confirmatory Memoranda in Determining the Scope, Operation and Effect of 'No Oral Modification' Clauses*, 48 U.Pitt.L.Rev 1239 (1987).

### 2. Section 2–209(4) of the California Commercial Code

Section 2–209(4) of the CCC adds another dimension of complexity by providing that an "attempt at modification" that does not satisfy a contractual requirement of written modifications only nonetheless "can operate as a waiver." The CCC does not define the term "waiver" but at common law it denoted intentional forfeiture of a known right. *Ma v. City and County of San Francisco*, 95 Cal.App.4th 488, 115 Cal.Rptr.2d 544, 555 (2002) (observing that when statutory law "is consistent with common law principles, it has been viewed as a continuation of the common law and not as a new enactment.").

Looking to the UCC for guidance, its framers drafted the waiver provision in Section 2–209(4) to prevent a contract which prohibits modification except by writing "from limiting the legal effect of the parties' actual later conduct." UCC § 2–209, Official Comment 4. California precedent explicitly echoes that view; an *executed* oral agreement may modify a contractual term even if that term provides that modifications must be in writing. *Miller v. Brown*, 136 Cal.App.2d 763, 775, 289 P.2d 572 (1955).

Section 2–209(4) is broadly understood not to override Section 2–209(2) but rather to allow modification in circumstances where there is clear factual evidence such as a course of performance. 6 *Corbin on Contracts* 211 (1962); *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1287 (7th Cir.1986)(quoting 2 Hawkland, *Uniform Commercial Code Series § 2–209:05*, at p. 138 (1985)). Because the principal purpose of "forbidding oral modifications is to prevent the promisor from fabricating a modification that will let him escape his obligations under the contract", substitute consideration, such as detrimental reliance, may constitute a waiver in some circumstances. *Wisconsin Knife Works*, 781 F.2d at 1287.

In instant case, reading the pleadings in the light most favorable to the plaintiff, there is a colorable argument that the plaintiff detrimentally relied upon the defendant's promise to refund all monies paid under the Agreement by neither pursuing legal action nor terminating the contract and engaging other vendors to meet its requirements. Yet, reliance, without more, does not give rise to an entirely new contract. ePresence has failed to offer even a scintilla of evidence that there was a second, oral contract.

Accordingly, this Court finds that there was no subsequent oral contract and Count I of the Complaint alleging breach of oral contract will, therefore, be dismissed.

### D. Count III: Chapter 93A

■ California law governs the instant dispute insofar as it arises out of or relates to the Agreement. The gravamen of the Complaint and the basis of the 93A claim is that there was a breach of contract. Indeed, the Complaint posits that "Evolve's failure to honor either the written Agreement or its oral agreements" was an unfair or deceptive practice in violation of Chapter 93A.

Public policy considerations, no matter how compelling, do not alter the plain language of the Agreement. The mere fact

that the defendant "acted with bad motive" does not render the Agreement's choice of law provision inapplicable, but rather the critical question is whether the alleged bad conduct brings "these claims outside the scope of the contractual language that says California law will govern." *Northeast Data Systems*, 986 F.2d at 609. In the instant dispute, the Agreement's choice-of-law provision means that California law governs any actions related to the Agreement even if the defendant's conduct was unfair or deceptive. *Id.* at 610. Therefore, the plaintiff's Chapter 93A claim will be dismissed.

## ORDER

For the reasons stated in the Memorandum above, Evolve's Motion to Dismiss Counts I and III of the Complaint (Docket No. 4) is **ALLOWED.**

**So ordered.**