**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 26, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

03-40652

PROPULSION TECHNOLOGIES, INC., d/b/a PowerTech Marine Propellers,

Plaintiff-Appellee-Cross-Appellant,

VERSUS

ATTWOOD CORPORATION; ET AL,

Defendants,

ATTWOOD CORPORATION,

Defendant-Appellant-Cross-Appellee.

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, DUHÉ, and STEWART, Circuit Judges.

DUHÉ, Circuit Judge:

Plaintiff Propulsion Technologies d/b/a PowerTech! Marine Propellers ("PowerTech") markets small steel boat propellers manufactured by a unique "segmented blade" tooling technique. Defendant Attwood Corporation formerly operated a foundry and produced rough castings of propellers for PowerTech. A jury found that Attwood breached a contract with PowerTech, fraudulently induced PowerTech to enter into the contract, and misappropriated trade secrets. It awarded PowerTech actual and punitive damages. After post trial motions, the district court denied a request by PowerTech for attorney's fees and entered judgment in an amount

reflecting the damages awarded for fraudulent inducement, misappropriation of trade secrets, and punitive damages, but not contract damages.[1] Attwood appeals, contesting each claim on which damages were awarded, and PowerTech cross appeals, contesting the ruling on attorney's fees and asking for reinstatement of contract damages.

Because the agreement is unenforceable under the statute of frauds as a transaction in goods with no ascertainable quantity term, we reverse and render.

## I.   FRAUDULENT INDUCEMENT CLAIM.

At the close of PowerTech's evidence, Attwood moved for judgment as a matter of law urging that the Texas Uniform Commercial Code governed the parties' agreement and that its statute of frauds bars recovery.[2]  The statute of frauds bars recovery under a sales contract that lacks a written quantity term or a written specification that the buyer will purchase exclusively from the seller.[3]  Attwood points out that the agreement at issue, a letter of January 28, 1997, specifies no quantity of propellers nor contains any exclusivity provision.

But the district court denied the motion, refusing to hold as

---

[1]  The judgment recites all the items awarded by the jury but eliminates some duplication, ordering entry of judgment for $7,147,682, which is the total of the awards for fraudulent inducement ($366,771 in out-of-pocket damages and $1,440,571 in lost profits), misappropriation of trade secrets ($175,000), and punitive damages ($5,165,340).

[2]  27 R. 669, 673; 17 R. 1873-78.

[3]  Tex. Bus. & Com. Code Ann. § 2.201 (a) (West 1994) (discussed infra subpart D).

2

a matter of law that the U.C.C. governed the agreement. To the contrary, the court determined that the U.C.C. did not apply because the contract was not a sale of "goods."[4] The district court held that the agreement was a "hybrid contract" for both services and goods, and that the predominant purpose of the contract was the provision of "services" rather than the sale of "goods."[5] If correct, the common law rather than the U.C.C. would apply, and the statute of frauds — found in section 2.201 of the U.C.C. — would be inapplicable.

A. Waiver.

PowerTech first contends that Attwood has waived the statute-of-frauds defense as it relates to fraudulent inducement. At its first motion for judgment as a matter of law, Attwood urged the statute-of-frauds defense but only on the breach-of-contract claim. Attwood did not argue that the statute of frauds could bar the fraud claim as well as the contract claim until it renewed its motion for judgment as a matter of law.

We need not determine whether Attwood preserved the precise argument that the statute of frauds would bar the fraudulent inducement claim because Attwood preserved the issue otherwise with the motion it made. One of the expressed bases for its motion for judgment as a matter of law on the fraud claim was insufficient

---

[4] The court had earlier ruled on Attwood's motion for partial summary judgment that the UCC governed this agreement as a sale of "goods." 14 R. 3030. By stipulation based on other concessions, this early ruling was vacated. 14 R. 2945.

[5] 28 R. 753–54.

evidence that PowerTech relied on any misrepresentations to its detriment.[6] This makes any issues preserved on the invalidity of the contract dispositive of the fraud claim because, "[w]ithout a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."[7]

Steve Powers, PowerTech's principal, testified that he entered the contract in reliance on Attwood's representations.[8] A fraudulent inducement claim "presupposes that a party has been induced to enter a contract."[9] If PowerTech did not incur a contractual obligation under the statute of frauds, then it would not have been "induced" to do anything.[10] There must remain a legally sufficient basis to support a finding of detrimental reliance to uphold the jury verdict on the fraud claim. This issue was preserved in Attwood's motion. Whether the contract claim fails under the statute of frauds was also indisputably preserved in Attwood's motion. If PowerTech's contract claim fails under the statute of frauds, then Attwood's motion for judgment should have been granted with respect to the fraud claim as well because no reasonable jury could find detrimental reliance. We find no waiver of any of these issues.

B. Standard of Review.

---

[6] 17 R. 1861, 1871.

[7] Haase v. Glazner, 62 S.W.3d 795, 798 (Tex. 2001).

[8] 24 R. 128.

[9] Haase, 62 S.W.3d at 797-98.

[10] Id. at 798.

Attwood contests the ruling on its Rule 50 motion for judgment as a matter of law. Whether a contract is predominantly for goods or services can involve issues of fact as well as law, but the district court found no facts in dispute on the issue.[11] Reviewing the denial of the motion for judgment as a matter of law, we employ the same standard as the trial court.[12] A Rule 50 motion for judgment as a matter of law "is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."[13]

C. Legal Sufficiency of the Evidence.

We agree with the district court that the evidence on whether the contract was a transaction in goods is undisputed and does not create an issue of fact for a jury. The interpretation of the contract is a question of law; further, as the district court stated, pertinent undisputed facts are "the basics of the process involved in producing propellers, the fact that Plaintiff provided the tooling needed to produce castings and . . . [the fact] that the castings provided by Attwood were finished and made into propellers by the Plaintiff."[14]

---

[11] 28 R. 754. See BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1331 (11th Cir. 1998) (question whether a contract is predominantly for goods or services is generally one of fact, but when there is no genuine issue of material fact, a court may determine the issue as a matter of law), cert. denied, 526 U.S. 1132, 119 S.Ct. 1807, 143 L.Ed.2d 1010 (1999).

[12] Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995).

[13] Id.; see also Fed. R. Civ. P. 50(a)(court may grant motion against a party if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party.").

[14] 28 R. 754.

The Texas U.C.C. applies to transactions "in goods."[15]  Our initial inquiry is whether the undisputed facts conclusively establish that the contract was a transaction in goods.  The U.C.C. definition of "goods" is "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale."[16]  This definition is broad.[17]  One of the declared purposes of the Code is "to simplify, clarify and modernize the law governing commercial transactions.  It is a general body of law intended as a unified coverage of its subject matter."[18]  As the Seventh Circuit has stated,

> [T]he scope of coverage of "goods" is not . . . narrow . . . but instead should be viewed as being broad . . . so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transactions.  The Code, which by its own terms, § 1-102, is to be liberally construed, should be uniformly applied to achieve its purposes.[19]

Under the Code manufacture-and-sale contracts are not even considered "hybrid" contracts; rather, by the very definition in the statute, a transaction in "goods" encompasses a seller's manufacture and sale of products.[20]

---

[15]  Tex. Bus. & Com. Code Ann. § 2.102.

[16]  Id. § 2.105(a).

[17]  Associates Discount Corp. v. Rattan Chevrolet, Inc., 462 S.W.2d 546, 549 (Tex. 1970).

[18]  Id. at 548 (citation omitted).

[19]  Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., 532 F.2d 572, 580 (7th Cir. 1976) (footnote omitted).

[20]  Tex. Bus. & Com. Code Ann. § 2.105(a).

PowerTech has emphasized the facts that Attwood used the buyer's trade secrets and employed the buyer's tooling to make the castings.  These elements do not prevent Attwood from being deemed a manufacturer of "goods."  The fact that a manufactured item is custom designed for the buyer's needs and is not readily marketable to others is not dispositive — manufactured goods are still "goods."[21]

The district court was impressed with the service aspect of the contract.  True, Attwood was required to provide foundry services and insure quality control.  But labor is "an input into the manufacture of every good."[22]  Manufacture always involves some services, such as engineering, design, fabrication and inspection.[23] "'"Services . . . always play an important role in the use of goods, whether it is the service of transforming the raw materials into some usable product or the service of distributing the usable product to a point where it can easily be obtained by the

---

[21]  The U.C.C. specifically addresses the circumstance of goods "to be specially manufactured for the buyer and . . . not suitable for sale to others in the ordinary course of the seller's business."  Tex. Bus. & Com. Code Ann. § 2.201(c)(1).  See also, e.g., Custom Controls Co. v. Ranger Ins., 652 S.W.2d 449, 451-52 (Tex. App.—Houston [1st Dist.] 1983, no writ) (well head control panels specifically designed for and constructed to meet particular needs of customer, not readily marketable to anyone else, were "goods"); Pittsburgh-Des Moines Steel, 532 F.2d at 580 (contract for design, manufacture, and erection of million-gallon water tower was for "goods"); Kline Iron & Steel Co., Inc. v. Gray Communications Consultants, Inc., 715 F.Supp. 135, 138 (D. S.C. 1989)(erection of tv tower was sale of "goods," although designed and engineered for customer).

[22]  Micro Data Base Sys., Inc. v. Dharma Sys., Inc., 148 F.3d 649, 655 (7th Cir. 1998).

[23] Kline Iron, 715 F.Supp. at 139.

consumer."'"[24]

We conclude that Attwood's furnishing the propeller castings was indeed a sale of "goods." As stated about a water tower in the Seventh Circuit case noted above, "In the words of the UCC this was a 'movable' 'thing' 'specially manufactured.' That which [the seller] agreed to sell and [the purchaser] agreed to buy was not services but goods as defined in the U.C.C."[25] The same can be said much more easily of these castings.

D. Hybrid Analysis: Dominant Factor of Transaction.

As mentioned, we find the hybrid analysis employed by the district court inapposite to such a contract. Were we to employ the hybrid analysis, however, we would reach the same result. "In such hybrid transactions [such as building contracts involving the sale of both services and materials], the question becomes whether the dominant factor or essence of the transaction is the sale of materials or of services."[26] We hold alternatively that, under the hybrid analysis, the evidence conclusively establishes that the dominant factor of this contract was a sale of goods.

Unlike many hybrid contracts deemed to be predominantly for services, this contract does not have as an important aspect some installation or construction to be completed by the seller after

---

[24] Id. (quoting Bonebrake v. Cox, 499 F.2d 951, 958-59 (8th Cir. 1974)(quoting Robert J. Nordstrom, Handbook of the Law of Sales 40, 47 (1970))).

[25] Pittsburgh-Des Moines Steel, 532 F.2d at 580.

[26] G-W-L, Inc. v. Robichaux, 643 S.W.2d 392, 394 (Tex. 1982), overruled on other grounds by Melody Home Mfg. Co. v. Barnes, 741 S.W.2d 349 (Tex. 1987).

delivery.  We easily distinguish such contracts as, for example, to install flooring[27] or a drainage system,[28] to build a house,[29] to complete a chimney,[30] or to construct or install a swimming pool[31] or a shingled roof.[32]  Even though such contracts include the cost of materials, they are considered primarily for rendition of services, with goods being only incidental.

Even where the production of goods is labor-intensive and the cost of goods is relatively inexpensive, such as for wedding photographs[33] or custom computer software,[34] jurisprudence has

[27]  Ranger Constr. Co. v. Dixie Floor Co., Inc., 433 F.Supp. 442, 445 (D.S.C. 1977).

[28]  Peltz Constr. Co. v. Dunham, 436 N.E.2d 892, 894 (Ind. App. 4th Dist. 1982).

[29]  G-W-L, 643 S.W.2d at 394 (alternative holding).

[30]  Cacace v. Morcaldi, 37, 435 A.2d 1035, 1038 (Conn. Super. 1981).

[31] Gulash v. Stylarama, Inc., 364 A. 2d 1221, 1223 (Conn. C.P. 1975), and Ben Constr. Corp. v. Ventre, 257 N.Y.S.2d 988, 989 (N.Y. App. Div. 1965), each decided the service element of installing or constructing a swimming pool predominated.  Chlan v. KDI Sylvan Pools, Inc., 452 A.2d 1259, 1261 (Md. 1982), held that an in-ground pool made of concrete is not a "good" because it was never simultaneously "movable" and existing.  But where a prefabricated pool was set into an excavated site, Riffe v. Black, 548 S.W.2d 175, 177 (Ky. App. 1977), viewed the agreement as one primarily for "goods."

[32]  Montgomery Ward & Co., Inc. v. Dalton, 665 S.W.2d 507, 511 (Tex. App.–El Paso 1983, no writ).

[33]  Carpel v. Saget Studios, Inc., 326 F. Supp. 1331, 1333 (E.D. Pa. 1971) (delivery of photographs would be a sale of "goods").

[34]  RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985)("[S]ales aspect of [custom software package] predominates. The employee training, repair services, and system upgrading were incidental to sale of the software package and did not defeat characterization of the system as a good."); Micro Data

considered the contracts for production and delivery to be transactions predominately in "goods." This contract would have to be much more service oriented for its "essence" or "dominant" factor to be the furnishing of services.

One PowerTech point of emphasis is that Attwood produced only unfinished "ugly duckling" castings, that is, rough castings that required refinement by PowerTech before marketing. PowerTech's finishing process involved checking pitch, machining the interior, grinding, balancing, polishing, and adding serial numbers and a rubber clutch.[35] The unfinished aspect is not dispositive. The U.C.C. makes no exception for goods that require servicing before they can be used.[36] Even natural resources and raw materials are considered "goods."[37] The U.C.C. definition plainly encompasses unfinished products.[38]

---

Base Sys., 148 F.3d at 654; Colonial Life Ins. Co. of America v. Electronic Data Sys. Corp., 817 F.Supp. 235, 239 (D.N.H. 1993); ePresence, Inc. v. Evolve Software, Inc., 190 F. Supp. 2d 159, 163 (D. Mass. 2002).

[35] 24 R. 53, 61-63.

[36] Meyers v. Henderson Constr. Co., 370 A.2d 547, 549-50 (N.J. Super. Law Div. 1977) (holding that prefabricated but disassembled overhead doors which were useless without substantial amount of labor by seller in assembling and installing were nonetheless "goods").

[37] According to the U.C.C., "'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty . . . ." Tex. Bus. & Com. Code Ann. § 2.105(a).

[38] See, e.g., Valley Iron & Steel Co. v. Thorin, 562 P.2d 1212, 1215 (Or. 1997) (castings of hoedad collars to be later incorporated into tree-planting tools by joining wooden handle and metal blades were indisputably "goods").

Moreover, the additional work described was to be done by PowerTech, not by Attwood. Our focus is what Attwood was providing. When a materialman deliver materials to be incorporated or constructed by a buyer or general contractor, the things are "goods" sold[39]; services to be provided later by others are not even considered in that determination. Services provided by PowerTech do not affect our conclusion that in the transaction at issue Attwood was predominately providing "goods."

PowerTech asks us to follow a Texas appellate case, <u>Printing Center of Texas v. Supermind Publishing Co.</u>[40] Considering a contract to print books, the <u>Printing Center</u> court "indulge[d] in the doubtful assumption that [the U.C.C.] governed the contract," while opining that the dominant factor was actually services.[41] We do not believe the Texas Supreme Court would follow that dictum to hold that the service element predominates in this contract.[42]

Our conclusion in this hybrid analysis is supported not only

---

[39] <u>E.g.</u>, <u>Westech Eng'g, Inc. v. Clearwater Constructors, Inc.</u>, 835 S.W.2d 190, 194 (Tex. App.—Austin 1992, no writ) (wastewater-treatment equipment provided by subcontractor to the general contractor constructing a treatment plant); <u>City of Salem ex rel. NuEquitable Leasing Co. v. Clearwater Constr. Co.</u>, 735 P.2d 373, 374 (Or. App. 1987) (rock products for buyer's construction project); <u>Custom Controls</u>, 652 S.W.2d at 452 (custom manufactured wellhead control panels to be delivered to agent for gas company).

[40] <u>Printing Center of Texas, Inc. v. Supermind Pub. Co., Inc.</u>, 669 S.W.2d 779 (Tex. App.–Houston [14 Dist.] 1984, no writ).

[41] <u>Id.</u> at 782-83.

[42] More persuasive in our opinion is a case that surveyed U.C.C. cases on printing and determined that publishing a magazine was providing "goods." <u>Gross Valentino Printing Co. v. Clarke</u>, 458 N.E.2d 1027, 1029-30 (Ill. App. 1st Dist. 1983).

by the circumstances surrounding the contract, but also by the contractual language and the nature of the goods at issue. Every aspect of the letter agreement points to the fact that it is for manufacture and delivery of a "product." It repeatedly refers to the "product," and its very purpose is to describe the terms of Attwood's "production" of stainless steel propellers to PowerTech. The contract requires Attwood to cover "propellers produced" with product liability insurance. Finally, Attwood warrants the propellers produced for PowerTech against defects in materials and workmanship.[43] These provisions contemplate that key element is not services but the products or "goods."[44] The only provisions remotely related to services are the requirements for quality testing and maintenance of quality standards and a mention of "direct production labor costs" -- the very labor and services involved in manufacturing the "goods."

Other factors supporting our conclusion are that the letter calls PowerTech a "customer" of the foundry,[45] and that Attwood was

---

[43] Pl. ex. 19.

[44] See, e.g., Bonebrake v. Cox, 499 F.2d 951, 958 (8th Cir. 1974) (terminology in contract for sale and installation of bowling alley, referring to "equipment" and to lanes free from "defects in workmanship and materials," is peculiar to "goods" and does not comport with contract for rendition of services).

[45] Bailey v. Montgomery Ward & Co., 690 P.2d 1280, 1282 (Colo. App. 1984) (recognizing that a contract that identifies one of the parties as the "customer" signals a transaction in goods); cf. Ranger Constr., 433 F. Supp. at 445 (contract's reference to defendant as "subcontractor" rather than materialman is one factor establishing that flooring installation contract is for construction not goods).

paid per casting.[46]  Finally, the fact that movable goods are involved is another "hallmark of a contract for goods rather than services."[47]

The undisputed facts conclusively establish that the dominant factor or essence of the contract is the sale of "goods" — namely, the delivery of a quality casting to PowerTech.  The contract is thus governed by the U.C.C. under our alternative analysis as well.

E.  No Detrimental Reliance without a Contract.

Having determined that the U.C.C. governs this case, we next apply the statute of frauds to the contract.  The Texas statute of frauds states in relevant part:  "[T]he contract is not enforceable . . . beyond the quantity of goods shown in [the] writing."[48]  The formality of written quantity term is satisfied by a written specification that buyer will buy exclusively from seller or will buy its "requirements" from seller.[49]  Steve Powers, PowerTech's principal, testified that he believed exclusivity was the parties' intent.[50] But under the statute of frauds an exclusivity provision

---

[46]  Bailey, 690 P.2d at 1282 (factor suggesting that primary purpose of contract was sale of goods was that plaintiff was charged only price of tires, with no charge for installation); Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 743 (2d Cir. 1979) (bill for purchase price without bill for installation services is "recognized indicia" of contract for goods.)

[47]  BMC Indus., 160 F.3d at 1330.

[48]  Tex. Bus. & Com. Code Ann. § 2.201(a).

[49]  Id. § 2.306; see also Merritt-Campbell, Inc. v. RxP Products, Inc., 164 F.3d 957, 963 (5th Cir. 1999)(recognizing applicability of statute of frauds to option and requirements contracts).

[50]  24 R. 127.

or quantity term must be "written."[51] This contract states merely that Attwood "agrees to establish minimum order requirements which are suitable to [PowerTech] and Attwood . . . on an annual basis, beginning in June of 1997."[52] Because it lacks any promise by PowerTech to purchase an ascertainable quantity, the agreement is not enforceable for lack of consideration or mutuality.[53]

PowerTech contends that the statute of frauds does not bar recovery because partial performance makes the contract enforceable. Indeed an exception to the formal requirements of the statute of frauds is made for partial performance "with respect to goods for which payment has been made and accepted or which have been received and accepted."[54] This case does not fall within that exception, however, because the dispute does not concern goods accepted or for which payment has been made and accepted.

We uphold a jury verdict unless there is no legally sufficient

---

[51] Tex. Bus. & Com. Code Ann. § 2.201 (requiring written quantity term); Eastern Dental Corp. v. Isaac Masel Co., Inc., 502 F. Supp. 1354, 1363 (E.D. Pa. 1980) (statute of frauds' requirement of a writing applies to requirements contracts), cited with approval in Merritt-Campbell, 164 F.3d at 963.

[52] Pl. ex. 19.

[53] Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493, 43 S. Ct. 592, 594 (1923); Mid-South Packers, Inc. v. Shoney's, Inc., 761 F.2d 1117, 1120-21 (5th Cir. 1985) (without buyer's commitment to purchase exclusively from the seller either buyer's entire requirements or up to a specified amount, a requirements contract fails for want of consideration).

[54] Tex. Bus. & Com. Code Ann. § 2.201(c)(3); see also Comment 2 following § 2.201: "'Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted."

14

evidentiary basis for a reasonable jury to find as the jury did.[55] Without an ascertainable quantity term, the evidence provides no basis for a reasonable jury to determine the obligations of the parties. As discussed above, "[w]ithout a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."[56] Because the foundational contract claim has not survived, there remains no legally sufficient basis to support a jury verdict for PowerTech on the fraud claim. Under Rule 50 standards, Attwood's motion should have been granted with respect to the fraud claim because no reasonable jury could find detrimental reliance.

## II. MISAPPROPRIATION OF TRADE SECRETS.

Attwood also moved for judgment as a matter of law on PowerTech's claim for misappropriation of trade secrets. Our review of the record convinces us that PowerTech did not establish proof of *use* of trade secrets and *loss resulting from that use* sufficient to create a jury issue on the claim.[57]

PowerTech argues that a reasonable inference of Attwood's use arose from the testimony of Kemper Morrow, that producing PowerTech's propellers "kind of gave [Attwood] the ability to learn

---

[55] Fed. R. Civ. P. 50(a)(1).

[56] Haase, 62 S.W.3d at 798.

[57] See Avera v. Clark Moulding, 791 S.W.2d 144, 145 (Tex. App. — Dallas 1990, no writ) (one element of proof of misappropriation of trade secrets is "proof . . . that the defendant used the trade secret without authorization from the plaintiff"); Metallurgical Indus. Inc. v. Fourtek, Inc., 790 F.2d 1195, 1205 (5th Cir. 1986) (recognizing commercial use as an element of the tort).

15

how to make them."[58]  That testimony does not describe use of a trade secret.  In fact none of the witnesses asked about PowerTech's trade secrets were able to support the claim that Attwood used PowerTech's secret design, tooling, or engineering.[59] To the contrary, Steve Powers pointed out two design differences notable in Attwood's small propellers.[60]  Powers also testified that other propeller manufacturers use tool designs different from PowerTech's.[61]  This record forecloses an inference of misuse of trade secrets relating to PowerTech's design of tools or propellers.

Nor was there evidence of *damages* (PowerTech's loss or anyone else's gain) from the use of confidential designs sufficient to sustain a damage award.  PowerTech's own expert Charles Cummings measured Attwood's profits from sales of Attwood's own line of propellers, but the missing link for recovery of such damages remains: there is no evidence that Attwood used trade secrets to generate those profits.[62]  The evidence is insufficient to support the verdict, because PowerTech failed to meet its burden of proof on each of the elements of the claim.  Accordingly, Attwood's motion for judgment as a matter of law is meritorious with respect

---

[58]  26 R. 314.

[59]  See testimony of former product engineer for Attwood, Mr. Gerlach (27 R. 733-34) and Mr. Charles Cummings (27 R. 606-07).

[60]  24 R. 122.

[61]  24 R. 65; see also id. at 54-57.

[62]  27 R. 606-07.

to the claim for misappropriate of trade secrets.

### III.  PUNITIVE DAMAGES

We need not attend the choice-of-law arguments on punitive damages because punitive damages cannot be awarded without a supporting tort claim.[63]

### IV.  CROSS APPEAL:  ATTORNEY'S FEES AND BREACH OF CONTRACT.

The district court entered a money judgment that did not include damages the jury awarded for breach of contract.[64] PowerTech asks us in its cross-appeal to reinstate the verdict on the contract damages if we reverse its fraud recovery.  The district court also held that under conflicts of laws, Texas law would not govern the question of attorney's fees.  Another aspect of PowerTech's cross-appeal asks us to reverse the court's choice-of-law ruling so that attorney's fees should be available under Texas law.

Both aspects of the cross appeal presuppose an enforceable contract.  The statute of frauds thus forecloses the possibility of PowerTech attaining either prayer for relief on its cross appeal.

### V.  CONCLUSION

We reverse the judgment entered on the verdict because without an underlying contract, the claim for fraud in the inducement

---

[63]  See Tex. Civ. Prac. & Rem. Code § 41.004(a)(exemplary damages may be awarded only if actual damages are awarded); see also id. § 41.004(a)(requiring proof by clear and convincing that harm resulted from the underlying tort).

[64]  The verdict itemized contract damages for "direct and mitigation" in the amount of $967,099, and for lost profits in the amount of $1,440,571 — the same figure awarded as lost profits awarded for fraudulent inducement.

17

cannot survive.  The evidence is insufficient for a reasonable jury to find an enforceable contract or detrimental reliance on any misrepresentations.  A dearth of evidence suggesting the use by Attwood of confidential information or confidential design or any loss by such use precludes PowerTech's recovery for misappropriation of trade secrets.  Judgment as a matter of law for Attwood denying relief on those claims of PowerTech is appropriate. Nor is relief available to PowerTech on its cross appeal.

REVERSED and RENDERED.